UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARC ISENBERG, JASON DELLISANTI, CARMEL MCCOLGAN, PATRICK STACK, PETER SCHUMAN, KEVIN LIM, STEVEN KOSOFF,HENDRICK MOY, ELNUR ALIYEV, BARBARA JOHNSON, TERRY STINSON, PATRICK KEELEY and BOB LOFTUS on behalf of themselves and the Putative Class,<br><br>Plaintiffs,<br><br>v.<br><br>TOYOTA MOTOR SALES, USA, INC., TOYOTA MOTOR NORTH AMERICA, INC. and TOYOTA MOTOR CORPORATION,<br><br>Defendants. | Case No.<br><br><br>Civil Action<br><br>CLASS ACTION COMPLAINT AND JURY DEMAND |

Plaintiffs, Marc Isenberg, Jason DelliSanti, Carmel McColgan, Patrick Stack, Peter Schuman, Kevin Lim, Steven Kosoff, Hendrick Moy, Elnur Aliyev, Barbara Johnson, Terry Stinson, Patrick Keeley and Bob Loftus and by their attorneys, Nagel Rice LLP, on behalf of themselves and all others similarly situated, make the following allegations on personal knowledge and information and belief:

I.   NATURE OF THE ACTION

1.   Plaintiffs bring this action for actual damages, equitable relief, including restitution, injunctive relief, and disgorgement of profits, and all other relief available on behalf of themselves and all similarly-situated individuals (the "Class") and entities who own, lease or have owned or have leased a Toyota

RAV4 Hybrid AWD or RAV4Prime AWD for model years 2019—present, Toyota Highlander Hybrids AWD for model year 2020, 2021 and 2022, Venza Hybrid AWD vehicles from 2021 and 2022, and  LEXUS NX350h AWD for 2021 and 2022 and NX450H AWD plug in Hybrid for  2022, (hereinafter, the "Class Vehicles") manufactured and/or sold by the Defendants, Toyota Motor Sales, U.S.A., Inc. ("TMS"), Toyota Motor North America, Inc. ("TMA"), and Toyota Motor Corporation ("TMC") (collectively, "Toyota" or "Defendants").

2.  All the claims asserted herein arise out of Toyota's design, manufacture, and warranting of the Class Vehicles, as well as Toyota's advertising, promoting, marketing, distributing, selling and leasing of the Class Vehicles as one of the most dependable, safe, and reliable vehicles available.

3.  The Class Vehicles are designed and manufactured with a uniform manufacturing and design defect (herein the "Defect"). All the Class Vehicles are equipped with a hybrid system cable which runs from the front of the vehicle to the rear electric motor. However, the orange cable connector has little protection from the elements including, but not limited to, snow, rock salt, and other debris coming off the road. As a result, this cable and connector is susceptible to corrosion, particularly where the high voltage wire harness connects to the MGR connector. When corrosion and/or dirt builds up at the MGR connector, the Class Vehicles experience a short in the MGR connector, may experience noise or distortion

when listening to the radio, and ultimately the hybrid system will become inoperable requiring replacement of the entire cable.

4.   What makes matters worse, is that it generally takes several years for the cable corrosion to get to the point where the Defect manifests itself, but Toyota has taken the position that the cable is covered only by the 3 year/36,000 mile basic warranty; rather than the Toyota Hybrid Related Component Coverage ("Hybrid Component Warranty") which runs for 8 years or 100,000 miles, to 10 years from date of first use or 150,000 miles whichever comes first, or even the powertrain warranty which runs for 60 months/60,000 miles. The cost to replace the cable results in repair bills in the range of $4,200 to $7,000 which are routinely charged to the customer because the basic warranty has expired by the time these expensive repairs must be performed to operate the vehicle.

5.   There is no requirement in the owner's manual or service and warranty information booklet that the wiring harness and MGR connector should be inspected or maintained in any way when the vehicles are brought in for service. Further, even after this problem became a known issue, dealers are reluctant to voluntarily take the time to examine and clean or replace these parts.

6.   Clearly these are not parts that Class Vehicle purchasers anticipate breaking during the expected useful life of the Class Vehicles.   However, as will be detailed below, these

3

parts routinely fail resulting in expensive repairs which should be covered by the Hybrid Component Warranty.

7.     This Defect is inherent in the design and/or manufacture of the Class Vehicles' wiring harness that supplies electrical power to the rear motor. As a result of the Defect, Plaintiffs and the other members of the Class have been subject, and continue to be subject, to a potential safety risk if the vehicle shuts down without warning while on a busy road.

8.     Defendants knew or should have known before the time it sold the first Class Vehicle, that the Class Vehicles contained the Defect. Defendants had sole and exclusive possession of this knowledge at or before the time it sold the first Class Vehicle, at the time it made repairs outside the warranty and charged consumers for those repairs, and continues to remain in sole and exclusive possession of virtually all information regarding the Defect.

9.     Defendants concealed and failed to disclose the Defect, both at the time of sale or lease of the Class Vehicles either as new or certified pre-owned vehicles and on an ongoing basis, including but not limited to when the Class Vehicles were brought in for service. The Defect exposes drivers and occupants of the Class Vehicles, as well as others who share the road with them, to an increased risk of accident, injury, or death.

4

10.  At all times, Defendants concealed from and/or failed to disclose to Plaintiffs, the other members of the Class and all others in the chain of distribution, the Defect, and failed to remove the Class Vehicles from the marketplace or take appropriate remedial action. Instead, Defendants sold and serviced the Class Vehicles, and continue to sell and service the Class Vehicles, even though it knows and knew, or was reckless in not knowing, that the Class Vehicles contained the Defect, and that such failure would ultimately result in the inability of Plaintiffs and the other members of the Class to use their vehicles for their intended purpose during the time Plaintiffs and the other members of the Class reasonably expected they would have use of their vehicles. The Defect subjects Plaintiffs and the other members of the Class to an increased risk of accident, injury, or death as well as expensive repairs.

11.  Defendants omitted material information regarding the Defect from its marketing, advertising, sale, and lease of the Class Vehicles.

12.  The Defect has caused the Class Vehicles to fail prematurely, whether within or outside of the applicable warranty periods.

13.  Many owners and lessees of the Class Vehicles have complained in public forums and to Toyota dealerships about the

Defect and the specific problems it causes and have requested that Defendants address and remedy the Defect.

14. The extensive number of customer complaints, field investigations, communications with dealers and service technicians, discussions in on-line forums, and an attempted redesign, establish that Toyota knew of the Defect prior to the autumn of 2020, which is when Toyota created Tech Tip T-TT0630-20 entitled "Corrosion on MGR Cable" for the 2019 and 2020 Toyota RAV4 Hybrids and sent this Tech Tip to dealers in the United States, but did not disclose this information to the general public or class members. Toyota concealed this information from the public and placed and continued to place the Class Vehicles in the stream of commerce knowing that class members would be adversely affected.

15. As a direct and proximate consequence of Toyota's active and ongoing concealment and omission of the Defect, Plaintiffs and the other members of the Class purchased, leased, and currently own or lease defective vehicles and have incurred damages thereby.

16. Had Plaintiffs and other members of the Class known of the Defect at the time of purchase or lease, they would not have bought or leased their vehicles, or would have paid substantially less for them. Each Plaintiff and Class member has suffered an ascertainable loss resulting from Toyota's omissions and/or misrepresentations association with the Class Vehicles.

17.   Plaintiffs were provided with information about the characteristics, safety and high quality of the Class Vehicles both at the dealerships where they purchased the Class Vehicles and through Toyota's extensive advertising campaigns regarding quality and safety as intended by Toyota. However, no Plaintiff received information about the hybrid cable corrosion connector Defect prior to purchasing the vehicle.

18.   Plaintiffs seek actual damages, injunctive relief, restitution and/or disgorgement of profits, statutory damages, attorneys' fees, costs, and all other relief available to Plaintiffs and the Class.

## II.   PARTIES

19.   Plaintiff Marc Isenberg is a New Jersey citizen who resides in Sparta, New Jersey.

20.   Jason DelliSanti is a New Jersey citizen who resides in Howell, New Jersey.

21.   Plaintiff Carmel McColgan is a New York citizen who resides in East Syracuse, New York.

22.   Plaintiff Patrick Stack is a New York citizen who resides in East Syracuse, New York.

23.   Plaintiff Peter Schuman is a New York citizen who resides in Albany, New York.

24.   Plaintiff Steven Kosoff is a New York citizen who resides in Averill Park, New York.

25.  Plaintiff Kevin Lim is a New York citizen who resides in Liverpool, New York.

26.  Plaintiff Hendrick Moy is a New York citizen who resides in Poughkeepsie, New York.

27.  Plaintiff Elnur Aliyev is a Pennsylvania citizen who resides in Pittsburgh, Pennsylvania.

28.  Barbara Johnson is a Maryland citizen who resides in Phoenix, Maryland.

29.  Plaintiff Terry Stinson is a Tennessee citizen who resides in Chapel Hill, Tennessee.

30.  Plaintiff Patrick Keeley is an Idaho citizen who resides in Idaho Falls, Idaho.

31.  Plaintiff Bob Loftus is an Idaho citizen who resides in Moscow, Idaho

32.  Defendant Toyota Motor Sales, USA, Inc. ("TMS") is a California corporation with its principal place of business at 6565 Headquarters Drive, Plano, Texas 75024.

33.  Defendant Toyota Motor North America, LLC ("TMNA"), is a California corporation with its principal place of business at 6565 Headquarters Drive, Plano Texas 75024. TMNA is Toyota's sales and marketing arm in the United States and oversees sales and other operation in 49 states.  TMNA distributes both Toyota and Lexus vehicles and sells them through its dealer network.

34.  Defendant Toyota Motor Corporation ("TMC") is a Japanese corporation with offices at 1 Toyota-Cho, Toyota City, Aichi Prefecture, Japan. TMC is the parent corporation of TMS.

35.  At all relevant times, Defendants were engaged in the business of marketing, advertising, distributing, selling, and warranting automobiles, other motor vehicles and motor vehicle components in New Jersey and throughout the United States of America. Defendants drafted and published the owner's manual and service and warranty information materials and acted as the warrantor of vehicles constructed by the Defendants which are sold in the USA.

36.  There exists at all times relevant hereto, a unity of ownership between TMNA, TMS and TMC and their agents, such that any individuality or separateness between them has ceased and each is the alter ego of the other. The three entities communicate with each other concerning virtually all aspects of the products distributed within the USA.

Plaintiffs' Experiences

37.  On August 11, 2020, Marc Isenberg ("Isenberg") purchased a brand new 2019 RAV4 Hybrid LE from Toyota of Morristown in New Jersey for $27,000. This was Isenberg's fourth RAV4 since 2002 as he valued their reputation for reliability and good gas mileage.

38.  Isenberg still owns the Class Vehicle which is no longer under the standard warranty, although he bought an extended

warranty from the dealership where he purchased the car because he knew that the RAV4 Hybrid is heavily dependent on computer and electronic operations. The finance manager promised the extended warranty covered the entire vehicle bumper to bumper except for typical wear and tear on such items as tires and brake pads.

39.  Unbeknownst to Isenberg at the time of purchase, the Class Vehicle was built with the Defect rendering the vehicle subject to a short in the MGR connector due to the high voltage wire harness being subject to corrosion. Defendants engaged in unfair, negligent and deceptive conduct in designing, manufacturing, marketing, selling and servicing Class Vehicles with the Defect which has caused Isenberg diminished value of the Class Vehicle.

40.  Prior to his purchase, Isenberg considered the safety, fuel economy and reliability of the Class Vehicles, the features important to him, which was the subject of Toyota's marketing of the Class Vehicle. Isenberg also reviewed the Monroney sticker that Toyota placed on the window prior to his purchase, which advertised the Class Vehicles features, price, specifications, equipment, warranty, crash test ratings and gas mileage. Isenberg relied on the representations contained on the window sticker when deciding to purchase the Class Vehicle. The Monroney sticker did not disclose that the Class Vehicle possessed the Defect. None of

the representations received contained any disclosure related to the Defect.

41.   Isenberg first learned that there was an issue with respect to cable corrosion by happenstance when recently reviewing the RAV4 World Website.

42.   Had Toyota disclosed that this vehicle contained the Defect, Isenberg would not have purchased the vehicle, or would have paid significantly less for the vehicle.

43.   In April 2022, Jason DelliSanti ("DelliSanti") purchased a 2019 RAV4 AWD Hybrid XLE from Auto Lenders in New Jersey paying approximately $36,000 for the vehicle. At the time of purchase the vehicle had 29,000 miles and was still under the Toyota warranties. DelliSanti still owns the Class Vehicle which he purchased for personal use.

44.   Unknown to DelliSanti at the time of purchase, the Class Vehicle was equipped with the Defect rendering the vehicle subject to a short in the MGR connector due to the high voltage wire harness being subject to corrosion. Defendants engaged in unfair, negligent and deceptive conduct in designing, manufacturing, marketing, selling and servicing Class Vehicles with the Defect which has caused DelliSanti out-of-pocket loss and diminished the value of the Class Vehicle.

45.   Prior to his purchase, DelliSanti considered the safety, fuel economy and reliability of the Class Vehicles, the features

important to him, which are the subject of Toyota's marketing of the Class Vehicle.

46. None of the representations received contained any disclosure related to the Defect. Had Toyota disclosed that this vehicle contained the Defect, DelliSanti would not have purchased the vehicle, or would have paid significantly less for the vehicle.

47. DelliSanti only learned that his Class Vehicle was subject to the Defect when he started reading about it online. Had Toyota disclosed the Defect to DelliSanti he would not have purchased the vehicle or would have paid significantly less for the vehicle.

48. In September 2019, Carmel McColgan ("McColgan") purchased a new 2019 Toyota RAV4 LTD from Romano Toyota Ltd. in East Syracuse New York for approximately $40,000 prior to trade in. This vehicle was McColgan's fourth RAV-4. McColgan still owns the Class Vehicle which she purchased for personal use.

49. Unknown to McColgan at the time of purchase, the Class Vehicle was equipped with the Defect rendering the vehicle subject to a short in the MGR connector due to the high voltage wire harness being subject to corrosion. Defendants engaged in unfair, negligent and deceptive conduct in designing, manufacturing, marketing, selling and servicing Class Vehicles with the Defect which has caused McColgan out-of-pocket loss and diminished the value of the Class Vehicle.

50.   Prior to her purchase, McColgan considered the safety, fuel economy and reliability of the Class Vehicles, the features important to her, which are the subject of Toyota's marketing of the Class Vehicle. McColgan also reviewed the Monroney sticker that Toyota placed on the window prior to her purchase, which advertised the Class Vehicles features, price, specifications, equipment, warranty, crash test ratings and gas mileage. McColgan relied on the representations contained on the window sticker when deciding to purchase the Class Vehicle. The Monroney sticker did not disclose that the Class Vehicle possessed the Defect.

51.   None of the representations received contained any disclosure related to the Defect. Had Toyota disclosed that this vehicle contained the Defect, McColgan would not have purchased the vehicle, or would have paid significantly less for the vehicle.

52.   A few days prior to July 5, 2022, when the vehicle had 51,573 miles, McColgan received a Vehicle Alert on her dashboard. She was unable to get an appointment until July 5th because of the Holiday weekend. On the morning of her appointment the car would not start. She had the vehicle towed to the dealer. That same day, after receiving the estimate and learning that the repairs were not covered under the hybrid warranty, McColgan took a screen shot of the message which appeared on the Toyota connect app stating: "Hybrid System - A malfunction in the Hybrid System has been detected. Contact your Toyota dealer to have your vehicle

inspected. Call Dealer." The dealer checked for the hybrid message coming on and tested the system and found code POAA649 and an open internal failure to hybrid wiring requiring replacement. McColgan had to pay a total of $5,691.32 for these repairs, as Toyota refused to cover these repairs under any of the warranties. The dealer suggested that she buy a 5-year extended warranty which was available for purchase until the vehicle reached 60,000 mile. This extended warranty would cost $2,790 upfront and would supposedly cover the repair if the Defect manifested again. She declined to incur this additional expense.

53.  On May 6, 2021, Patrick Stack ("Stack") purchased a 2021 Toyota Venza AWD Hybrid LTD from Romano Toyota Ltd. in East Syracuse New York for approximately $43,785 with Platinum Shield. Stack still owns the Class Vehicle which he purchased for personal use.

54.  Unbeknownst to Stack at the time of purchase, the Class Vehicle was built with the Defect rendering the vehicle subject to a short in the MGR connector due to the high voltage wire harness being subject to corrosion resulting in a safety issue and the need for costly repairs. Defendants engaged in unfair, negligent and deceptive conduct in designing, manufacturing, marketing, selling and servicing Class Vehicles with the Defect which has caused Stack diminished value of the Class Vehicle.

55.   Prior to his purchase, Stack considered the safety, fuel economy and reliability of the Class Vehicles, the features important to him, which was the subject of Toyota's marketing of the Class Vehicle. Stack also reviewed the Monroney sticker that Toyota placed on the window prior to his purchase, which advertised the Class Vehicles features, price, specifications, equipment, warranty, crash test ratings and gas mileage. Stack relied on the representations contained on the window sticker when deciding to purchase the Class Vehicle. The Monroney sticker did not disclose that the Class Vehicle possessed the Defect. None of the representations received contained any disclosure related to the Defect.

56.   Stack only learned that his Class Vehicle was subject to the Defect when he started reading about it online. Had Toyota disclosed the Defect to Stack he would not have purchased the vehicle or would have paid significantly less for the vehicle.

57.   On or about February 2021, Peter Schuman ("Schuman") purchased a new 2021 RAV4 Hybrid Limited for $42,000 from Lia Toyota located in Schenectady, New York. This was Schuman's first hybrid vehicle, and he was especially interested in the advertised fuel economy as well as the advertised safety and reliability of Toyota vehicles. Schuman still owns the Class Vehicle which he purchased for personal use.

58.   Unbeknownst to Schuman at the time of purchase, the Class Vehicle was built with the Defect rendering the MGR subject to a short due to the high voltage wire harness being subject to corrosion resulting in a safety issue and the need for costly repairs. Defendants engaged in unfair, negligent and deceptive conduct in designing, manufacturing, marketing, selling and servicing Class Vehicles with the Defect which has caused Schuman diminished value of the Class Vehicle.

59.   Prior to his purchase, Schuman considered the safety, fuel economy and reliability of the Class Vehicles, the features important to him, which was the subject of Toyota's marketing of the Class Vehicle. Schuman also reviewed the Monroney sticker that Toyota placed on the window prior to his purchase, which advertised the Class Vehicles features, price, specifications, equipment, warranty, crash test ratings and gas mileage. Schuman relied on the representations contained on the window sticker when deciding to purchase the Class Vehicle. The Monroney sticker did not disclose that the Class Vehicle possessed the Defect. None of the representations received contained any disclosure related to the Defect.

60.   Schuman only learned that his Class Vehicle was subject to the Defect when he started reading about it online. Had Toyota disclosed the Defect to Schuman he would not have purchased the vehicle or would have paid significantly less for the vehicle.

**16**

61.  On or about May 25, 2021, Kevin Lim ("Lim") purchased a 2021 RAV4 Prime SE for approximately $42,000 from Romano Toyota Ltd. located in East Syracuse, New York. He also paid an extra $1,090 to Syracuse Rustproofing for undercoating.

62.  Lim was especially interested in the advertised fuel economy and the advertised reputation for safety and reliability of Toyota vehicles. Lim still owns the Class Vehicle which he purchased for personal use.

63.  When he purchased the vehicle Lim was unaware that the Class Vehicle was built with the Defect rendering the MGR subject to a short due to the high voltage wire harness being subject to corrosion resulting in a safety issue and the need for costly repairs. Defendants engaged in unfair, negligent and deceptive conduct in designing, manufacturing, marketing, selling and servicing Class Vehicles with the Defect which has caused Lim diminished value of the Class Vehicle.

64.  Prior to purchase, Lim examined the Monroney sticker that Toyota placed on the window prior to his purchase, which advertised the Class Vehicles features, price, specifications, equipment, warranty, crash test ratings and gas mileage. Lim relied on the representations contained on the window sticker when deciding to purchase the Class Vehicle. The Monroney sticker did not disclose that the Class Vehicle possessed the Defect. None of

17

the representations received contained any disclosure related to the Defect.

65.    Since he had paid for the undercoating package, Lim took the vehicle back to Syracuse Rustproofing the following year to have the undercoating inspected and touched up. Since Lim had seen the corrosion issue raised in online forums, he asked Syracuse Rustproofing to specifically address this location during the touch up.   Lim was informed that the undercoating company had received a specification from Toyota of what locations to stay away from and this cable connector was one of those locations Toyota specifically told the company not to rustproof. Consequently, Lim is afraid to take any action himself to coat that area because it may void the warranty. He feels stuck waiting for the vehicle to fail rather than risking the costs associated with a voided warranty.

66.    After the undercoating inspection, Lim crawled under the car to take a look himself and noticed there was a good amount of rust and corrosion starting to develop on the connector. This is the case even though Lim has the upgraded 2021 RAV4 Prime cable with the added drain. Lim is concerned that the Defect will manifest after the warranty expires. Consequently, he is in the midst of incurring an additional expense by purchasing an extended warranty from Toyota.

67. In early September 2022, Steven Kosoff ("Kosoff") purchased a new 2022 Lexus NX350H for approximately $49,000 from David McDermott Lexus of New Haven, Connecticut. He had read about the corrosion problems with the RAV4 Hybrids on social media and decided not to purchase that model. He sought out a more upscale brand by purchasing a Lexus. However, because Kosoff knew that the Lexus NX350H had the same chassis and design as the RAV4 Hybrid, he spent an additional $1,380 for a 6 year/100,000 mile extended warranty from the dealer.

68. Kosoff was especially interested in the advertised fuel economy and the advertised reputation for safety and reliability of Lexus/Toyota vehicles. Kosoff purchased the vehicle for personal and family use.

69. Defendants engaged in unfair, negligent and deceptive conduct in designing, manufacturing, marketing, selling and servicing Class Vehicles with the Defect which has caused Kosoff diminished value of the Class Vehicle and additional expenses associated with the purchase of the extended warranty.

70. Prior to purchase, Kosoff examined the Monroney sticker that Lexus placed on the window prior to his purchase, which advertised the Class Vehicles features, price, specifications, equipment, warranty, crash test ratings and gas mileage. Kosoff relied on the representations contained on the window sticker when deciding to purchase the Class Vehicle. The Monroney sticker did

not disclose that the Class Vehicle possessed the Defect. None of the representations received contained any disclosure related to the Defect.

71.  On June 30, 2022, Hendrick Moy ("Moy") purchased a 2022 RAV4 Prime XSE from DCH Toyota in Wappinger Falls, New York paying $56,586.16 including sales tax, for the vehicle. Moy still owns the Class Vehicle which he purchased for personal use.

72.  Unbeknownst to Moy at the time of purchase, the Class Vehicle was built with the Defect rendering the MGR subject to a short due to the high voltage wire harness being subject to corrosion resulting in a safety issue and the need for costly repairs. Defendants engaged in unfair, negligent and deceptive conduct in designing, manufacturing, marketing, selling and servicing Class Vehicles with the Defect which has caused Moy diminished value of the Class Vehicle.

73.  Prior to his purchase, Moy considered the safety, fuel economy and reliability of the Class Vehicles, the features important to him, which was the subject of Toyota's marketing of the Class Vehicle. Moy also reviewed the Monroney sticker that Toyota placed on the window prior to his purchase, which advertised the Class Vehicles features, price, specifications, equipment, warranty, crash test ratings and gas mileage. Moy relied on the representations contained on the window sticker when deciding to purchase the Class Vehicle. The Monroney sticker did not disclose

that the Class Vehicle possessed the Defect. None of the representations received contained any disclosure related to the Defect.

74. Moy only learned that his Class Vehicle was subject to the Defect when he started reading about it in the Facebook Groups. Had Toyota disclosed the Defect to Moy he would not have purchased the vehicle or would have paid significantly less for the vehicle.

75. On April 7, 2022, Elnur Aliyev ("Aliyev") purchased a 2022 Toyota RAV4 Hybrid XSE from Taylor Chevrolet Toyota of Hermitage, Pennsylvania paying over $48,000 for the vehicle, which was $3,000 over list price. Aliyev still owns the Class Vehicle which he purchased for personal use.

76. Unbeknownst to Aliyev at the time of purchase, the Class Vehicle was built with the Defect rendering the MGR subject to a short due to the high voltage wire harness being subject to corrosion resulting in a safety issue and the need for costly repairs. Defendants engaged in unfair, negligent and deceptive conduct in designing, manufacturing, marketing, selling and servicing Class Vehicles with the Defect which has caused Aliyev diminished value of the Class Vehicle.

77. Prior to his purchase, Aliyev considered the safety, fuel economy and reliability of the Class Vehicles, the features important to him, which was the subject of Toyota's marketing of the Class Vehicle. Aliyev also reviewed the Monroney sticker that

Toyota placed on the window prior to his purchase, which advertised the Class Vehicles features, price, specifications, equipment, warranty, crash test ratings and gas mileage. Aliyev relied on the representations contained on the window sticker when deciding to purchase the Class Vehicle. The Monroney sticker did not disclose that the Class Vehicle possessed the Defect. None of the representations received contained any disclosure related to the Defect.

78.   Aliyev only learned that his Class Vehicle was subject to the Defect when he started reading about it online. Had Toyota disclosed the Defect to Aliyev he would not have purchased the vehicle or would have paid significantly less for the vehicle.

79.   On May 24, 2022, Barbara Johnson ("Johnson") bought a 2022 RAV4 Prime XSE with the Premium Package from Thompson Toyota in Edgewood Maryland for $57,062.45. She was especially interested in the advertised fuel economy as well as the advertised safety and reliability of Toyota vehicles. Johnson still owns the Class Vehicle which she purchased for personal use.

80.   Unbeknownst to Johnson at the time of purchase, the Class Vehicle was built with the Defect rendering the MGR subject to a short due to the high voltage wire harness being subject to corrosion resulting in a safety issue and the need for costly repairs. Defendants engaged in unfair, negligent and deceptive conduct in designing, manufacturing, marketing, selling and

servicing Class Vehicles with the Defect which has caused Johnson diminished value of the Class Vehicle.

81.    Prior to her purchase, Johnson considered the safety, fuel economy and reliability of the Class Vehicles, the features important to her, which was the subject of Toyota's marketing of the Class Vehicle. Johnson also reviewed the Monroney sticker that Toyota placed on the window prior to her purchase, which advertised the Class Vehicles features, price, specifications, equipment, warranty, crash test ratings and gas mileage. Johnson relied on the representations contained on the window sticker when deciding to purchase the Class Vehicle. The Monroney sticker did not disclose that the Class Vehicle possessed the Defect. None of the representations received contained any disclosure related to the Defect.

82.    Johnson only learned that her Class Vehicle was likely subject to the Defect when she started reading about it online. She has seen photos of other vehicles that have experienced the corrosion and living in an area where the roads are frequently salted in the winter, she is concerned that she will be required to face a costly repair in the future. Had Toyota disclosed the Defect to Johnson she would not have purchased the vehicle or would have paid significantly less for the vehicle.

83.    On or about March 29, 2022, Terry Stinson ("Stinson") bought a 2022 Highlander Hybrid AWD, Platinum from Wolfchase Toyota

in Memphis Tennessee for approximately $60,000. She had previously owned a First Generation Toyota Highlander Hybrid which stayed in the family for 280,000 miles needing only routine maintenance. Thus, she knew that her next SUV would be a Toyota Highlander Hybrid. Stinson still owns the Class Vehicle which she purchased for personal use.

84.    Unbeknownst to Stinson at the time of purchase, the Class Vehicle was built with the Defect rendering the MGR subject to a short due to the high voltage wire harness being subject to corrosion resulting in a safety issue and the need for costly repairs. Defendants engaged in unfair, negligent and deceptive conduct in designing, manufacturing, marketing, selling and servicing Class Vehicles with the Defect which has caused Stinson diminished value of the Class Vehicle.

85.    Prior to her purchase, Stinson did extensive research online visiting and reviewing the Toyota site itself, as well as Consumer Reports, Edmunds, Car and Driver and others. She found no 'red flags' that caused her concern. As Stinson purchased the vehicle before it reached the lot, she did not review the Monroney sticker before deciding to make the purchase. However, the Monroney sticker did not disclose that the Class Vehicle possessed the Defect. Additionally, none of the representations received by reviewing the Toyota website or any other publications contained any disclosure related to the Defect.

24

86.    Stinson only learned that her Class Vehicle was likely subject to the Defect when she started reading about it on the Highlander Facebook Page. Had Toyota disclosed the Defect to Stinson she would not have purchased the vehicle or would have paid significantly less for the vehicle.

87.    On or about September 6, 2022, Patrick Keeley ("Keeley") bought a pre-owned 2021 Highlander Platinum Hybrid AWD, from Teton Toyota in Idaho Falls, Idaho for approximately $51,000. The vehicle had 6,500 at the time of purchase. Keeley was especially interested in the advertised fuel economy as well as the advertised safety and reliability of Toyota vehicles. Keeley still owns the Class Vehicle which he purchased for personal use.

88.    Unbeknownst to Keeley at the time of purchase, the Class Vehicle was built with the Defect rendering the MGR subject to a short due to the high voltage wire harness connector being subject to corrosion resulting in a safety issue and the need for costly repairs. Defendants engaged in unfair, negligent and deceptive conduct in designing, manufacturing, marketing, selling and servicing Class Vehicles with the Defect which has caused Keeley diminished value of the Class Vehicle.

89.    None of the representations received or advertisements about the vehicle contained any disclosure related to the Defect.

90.    Keeley only learned that his Class Vehicle was likely subject to the Defect when he started reading about it on Facebook

Page. Had Toyota disclosed the Defect to Keeley he would not have purchased the vehicle or would have paid significantly less for the vehicle.

91.   In March of 2021, Bob Loftus ("Loftus") purchased a 2021 Toyota Hybrid Limited Highlander AWD from Toyota of Pullman, which is in Pullman, Washington. He paid approximately $52,000 including an extended warranty and currently has approximately 33,000 miles on the vehicle. Loftus still owns the Class Vehicle which he purchased for personal use.

92.   Unbeknownst to Loftus at the time of purchase, the Class Vehicle was built with the Defect rendering the MGR subject to a short due to the high voltage wire harness connector being subject to corrosion resulting in a safety issue and the need for costly repairs. Defendants engaged in unfair, negligent and deceptive conduct in designing, manufacturing, marketing, selling and servicing Class Vehicles with the Defect which has caused Loftus diminished value of the Class Vehicle.

93.   Prior to his purchase, Loftus considered the safety, fuel economy and reliability of the Class Vehicles, the features important to him, which was the subject of Toyota's marketing of the Class Vehicle. Loftus also reviewed the Monroney sticker that Toyota placed on the window prior to his purchase, which advertised the Class Vehicles features, price, specifications, equipment, warranty, crash test ratings and gas mileage. Loftus relied on the

representations contained on the window sticker when deciding to purchase the Class Vehicle. The Monroney sticker did not disclose that the Class Vehicle possessed the Defect. None of the representations received contained any disclosure related to the Defect.

94.    Loftus only learned that his Class Vehicle was subject to the Defect when he started reading about it online. Had Toyota disclosed the Defect to Loftus he would not have purchased the vehicle or would have paid significantly less for the vehicle.

95.    At all times, Plaintiffs and the other members of the Class drove their vehicles in a foreseeable manner, and in the manner in which they were intended to be used.

96.    The proposed class representatives and proposed class members complied with all warranty and contractual obligations including all warranty, warranty notice, maintenance and product use obligations for their respective class vehicles. The proposed class representatives and proposed class members operated their class vehicles under normal anticipated conditions in noncommercial environments.

97.    Certain of the proposed class representatives were informed by a representative of Toyota that Toyota would not provide assistance in repairing or replacing the corroded hybrid cable and connector because the Class Vehicles were outside of the express warranty period.

98. Despite actual and constructive knowledge of class vehicle defects as described in this complaint, the Defendants failed to cure the Class Vehicle Defect within the express warranty period and thereby breached the terms of the express warranty.

99. Additionally, the Defendants refused to fully reimburse or compensate the proposed class representatives and class members for vehicle repair expenses or provide a suitable substitute or replacement vehicle during repairs for those who have already experienced the Defect.

100. Through no fault of their own, the proposed class representatives and proposed class members did not possess sufficient technical expertise to recognize symptoms of impending hybrid electric cable corrosion and failure.  This information, however, was well known to Toyota, but not revealed.

101. Plaintiffs and the Class have suffered an ascertainable loss as a result of the Defendants' omissions associated with the Defect, including but not limited to, out-of-pocket losses and diminished value of the vehicles.

102. Were Plaintiffs and the other members of the Class aware of the concealments, failures to disclose and omissions described herein, they would not have purchased their vehicles or would have paid significantly less for them.

### III. <u>JURISDICTION AND VENUE</u>

103. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2), as the Class contains more than 100 members, at least one of whom maintains citizenship in a state diverse from Defendants and seeks in the aggregate more than Five Million Dollars ($5,000,000.00), exclusive of costs and interest. This Court also has original federal question jurisdiction because Plaintiffs assert claims arising under the Magnuson-Moss Warranty Act, 15 U.S.C. Section 2301 et seq.

104. This Court has personal jurisdiction over the parties because Defendants conduct substantial business in New Jersey. Defendants have purposefully availed itself of the benefits and protections of the District of New Jersey by continuously and systematically conducting substantial business in this judicial district, and has agents and representatives that can be found in this State.

105. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Plaintiffs Isenberg and DelliSanti are citizens of this District, a substantial part of the events giving rise to the claims set forth herein occurred and emanated from this district, and Defendants' conduct has injured members of the Class residing in this district. Further, Defendants advertise in this district and it profits from its activities conducted within this district.

Accordingly, this Court has jurisdiction over this action, and venue is proper in this judicial district.

## IV. TOLLING OF STATUTE OF LIMITATIONS

106. Any applicable statute(s) of limitations have been tolled by Toyota's knowing and active concealment and denial of the facts alleged herein. Despite their due diligence, Plaintiffs and the other members of the Class could not have reasonably discovered the Defect until shortly before this class action litigation was commenced.

107. Toyota was and remains under a continuing duty to disclose to Plaintiffs and the other members of the Class the true character, quality and nature of the Defect, that the Defect will require costly repairs, that the Defect poses a safety concern, and that the Defect diminishes the resale value of the Class Vehicles. As a result of the active concealment by Toyota, any and all statutes of limitations otherwise applicable to the allegations herein have been tolled.

108. Moreover, because the Defect could not be detected due to Toyota's purposefully fraudulent concealment, Plaintiffs and the other members of the Class were not reasonably able to discover the Defect until long after purchasing or leasing the Class Vehicles, despite their exercise of due diligence. Thus, the discovery rule is applicable to the claims asserted by Plaintiffs and the other members of the Class.

109. Any applicable statute of limitation has therefore been tolled by Toyota's knowing, active concealment and denial of the facts alleged herein. Toyota is estopped from relying on any statutes of limitation because of its concealment of the Defect.

## V. <u>FACTUAL BACKGROUND</u>

### A. <u>The Class Vehicles & The Defect</u>

110. The Class Vehicles experiencing the Defect are all Toyota RAV4 Hybrids and Prime vehicles manufactured 2019-2022, as well as, Toyota Highlander Hybrids for model year 2020, 2021 and 2022, Venza Hybrid AWD vehicles from 2021 and 2022,  LEXUS NX350h AWD for 2021 and 2022 and NX450H AWD plug in Hybrid for  2022, based upon the identical design or substantially similar design of the orange cable connector, and the configuration and placement of the high voltage wire harness rendering the MGR subject to shorting out.

111. In the fall of 2020 Toyota issued Tech-Tip T-TT-0630-20 in the United States. The bulletin says the vehicles may trigger diagnostic trouble codes P0AA649 or P1C8049:

> "P0AA649-Hybrid/EV Battery Voltage System Isolation Internal Electronic Failure"
> "P1C8049-Hybrid/EV Battery Voltage System Isolation (Rear Motor Area) Internal Electronic Failure"
> "Vehicles exhibiting this condition have been experiencing a short in MGR connector due to corrosion."  Toyota indicated in this Tech Tip that "This issue is currently being investigated." (See Exhibit A)

112. Two years later, on March 24, 2022, Toyota Canada issued a more detailed technical bulletin informing dealers that some 2019-2020 RAV4 Hybrids may exhibit an illuminated Malfunction indicator Lamp, the vehicle may also experience noise or distortion when listening to AM radio, and that the conditions can be caused by corrosion in the high voltage wiring harness under the vehicle at the rear motor generator (MGR) caused by dirt and debris inside the connector. Thus, the newer Canadian bulletin seems to acknowledge a pattern of failure and claims to have introduced an improved part during assembly of the 2021 model year. However, this part still results in collecting of salt and debris leading to corrosion. (See Exhibit B for Canadian technical bulletin in French with English Translation attached). To date, Toyota in the United States has not acknowledged the Defect or issued a formal TSB or Recall providing for coverage for repairs, vehicle rentals while waiting for the repairs, or TREAD ACT[1] payments for prior repairs as required by Federal law.

113. The Canadian RAV4 Hybrid owners have been petitioning Toyota to issue a recall without success, and have filed a class action lawsuit in Canada. The Toyota RAV4 Hybrid and RAV4 Prime cable corrosion lawsuit was filed on May 19, 2022 in the Superior

---

[1] **Transportation Recall Enhancement, Accountability, and Documentation (TREAD) Act**

Court for the Province of Quebec District of Montreal and is entitled *Constantin Sultana v. Toyota Canada Inc.*

114. Between 2019 and 2021, it is estimated that 40,000 vehicles impacted by the Defect have been sold in Canada. The numbers in the United States are much greater and have been estimated at 360,389 RAV4 Hybrids and Primes and 113,612 Highlander Hybrids. These numbers do not include Venza or affected Lexus Hybrids, which have the same Defect.

115.  This photo below demonstrates the configuration of the Hybrid Engine and the Wiring Harness which is low to the ground and subject to dirt and debris.



116. The three photos below demonstrate the destruction and corrosion which occurs after the hybrid cables and connectors are exposed to the elements over time.







117.  The photo below demonstrates what is purportedly a new, and improved cable connector because it has a small slot where water and debris can allegedly come out on its own.  However, this new drainage slot does not solve the problem of road salt and

debris continuously getting into the opening and causing corrosion.



B.  **The Reasonable And Legitimate Expectations Of Plaintiffs
And The Members Of The Putative Class**

118. Customers purchasing or leasing vehicles reasonably and legitimately expect that those vehicles, like the Class Vehicles at issue herein, will properly function for many years.

119. In purchasing or leasing their vehicles, Plaintiffs and the other members of the Class reasonably and legitimately expected their vehicles to be reliable, and to operate in accordance with all of their intended purposes – including not having to replace the hybrid high voltage cable and connection that runs the length of the vehicle and is necessary to operate their Hybrid or Prime vehicle.

120. In purchasing or leasing their vehicles, Plaintiffs and the other members of the Class reasonably and legitimately expected that the Class Vehicles would be free from the Defect.

121. The existence of the Defect is a fact that would be considered material to a reasonable consumer deciding whether to purchase or lease an expensive Toyota vehicle. Particularly since Toyota touts its vehicles as lasting as long as 250,000 miles of use with proper maintenance.

122. Customers like Plaintiffs and the other members of the Class, reasonably and legitimately expect and assume that a vehicle will function in their intended manner, will not pose a safety hazard, and are free from defects. Plaintiffs and the other

members of the Class also reasonably and legitimately expect and assume that Defendants will not sell or lease vehicles with a known defect, will disclose any such defects to consumers when they learn of them, and take all steps to remedy any defect in a manner that does not cause additional cost to the customer. It was reasonable and legitimate for Plaintiffs and the other members of the Class to expect Toyota not to actively and intentionally conceal problems from them — such as the Defects described herein, to continually deny its existence, and refuse to bear the repair costs that become necessary to correct the problems resulting from the Defect.

123. Throughout the period that the Class Vehicles were sold and leased, Toyota marketed, promoted, and advertised the Vehicles as reliable, safe, and fuel efficient.

124. Plaintiffs and the other members of the Class reasonably and legitimately expected Toyota to disclose the existence of the Defects and that the Vehicles were prone to corrosion of the high voltage cable that connects to the MGR that were known to Toyota at the time of sale or lease, or when the vehicle was brought in for regular maintenance or repairs.

125. Plaintiffs and the other members of the Class could not have discovered the latent Defect through any reasonable inspection of their vehicles prior to purchase.

126.   As a consequence of Toyota's exclusive knowledge and concealment about the Defect, Toyota owners will not discover the problem until after regular warranty coverage has passed and Toyota has been unwilling to extend the warranty or apply the Toyota Hybrid Related Component Coverage Warranty or the powertrain warranty, both which provide longer periods of coverage.

127. As a direct and proximate result of the Defect, Plaintiffs and the other members of the Class have experienced shorts in the MGR connector causing the vehicles to stop driving, necessitating expensive repairs or a tow to the dealer. Plaintiffs and the Class did not receive what they paid for, and have incurred actual damages, including diminution in value.

128. Had Plaintiffs and other members of the Class known about the Defect while they were in the market for purchasing or leasing a vehicle, they would not have purchased or leased the Class Vehicles or, at the very least, would have paid less for them particularly due to the increased risk of accident, injury or death.

C. Defendants' Awareness Of The Defect

129. Plaintiffs allege that at all relevant times, specifically at the time they purchased or leased their vehicles and when their vehicles were brought in for service, Defendants knew of the Defect and the safety dangers of the Defect. Toyota

was under a duty to disclose the Defect based upon its exclusive knowledge of and/or concealed material information regarding the Defect; Toyota failed to disclose the Defect to Plaintiffs, other Class members, or the public at any time or place or in any manner such that it could (and would) have affected Plaintiffs' and other class members' pre-sale decision to purchase and/or lease the Class Vehicles.

130. The Defendants failed to inform Class Vehicle owners and lessees prior to purchase or during the express warranty period that the Hybrid High Voltage Electric MGR Cable Connector was subject to premature and fatal corrosion and would fail shortly after expiration of the express warranty. Toyota misrepresented by affirmative conduct and/or omission and/or fraudulent concealment that the Defect existed.

131. The Defendants also failed to inform Class Vehicle owners and lessees at the time of purchase that the Hybrid Cable and connector in their Class Vehicle's had been inadequately tested prior to placing the car in production and the time of Class Vehicle sale.

132. Toyota obtained knowledge that there was something wrong with the wiring harness cable prior to the Autumn 2020 as evidenced by that fact that they began to investigate the problem, made recommendations for dealer's to visually inspect the high voltage wire harness that connects to the MGR and directed that the

mechanics 'call TAS[2] for further inspections' without revealing the problem to class members.

133. Although this Tech Tip was not issued until 2020, Toyota knew there was a problem prior to that time, given the extensive complaints on numerous websites monitored by Toyota, including Toyota's own online forum, which included numerous complaints charging that corrosion problem with the high voltage wiring harness and the buildup of dirt and sediment in the connector posing an unreasonable safety hazard. Additionally, there are complaints posted on the database maintained by the National Highway Traffic Safety Administration which Toyota was clearly aware of. It is plain that Defendant knew of the Defect at the time when Plaintiffs and the class members purchased or leased their Class Vehicles.

134. Defendant also knew, or reasonably should have known, of the Defect based upon the number of complaints it received from its dealerships and service shops. For instance, multiple departments at Toyota interact with its dealerships and service shops in order to identify potentially widespread vehicle problems. These departments collect and analyze data from the dealerships and service shops in order to identify any problems in its vehicles.

---

[2] TAS stands for Technical Assistance.

135.  Toyota  requires  its  dealerships  to  sign  a  Dealer
Agreement  which  requires  the  dealerships  to  provide  Toyota  with
access  to  all  the  service  and  warranty  service  records  for  repairs
made  by  the  individual  dealerships.  The  Agreement  establishes  that
Toyota  requires  its  dealerships  to  have  a  computer  system  that
serves  as  Toyota's  primary  link  to  the  dealership,  including  for
parts,  ordering,  warranty  claims,  filing  of  reports,  etc.  Indeed,
even  the  Technical  Tip  itself  directs  the  dealers  to  report  their
findings  to  TAS.

136.  Further,  Toyota's  customer  relations  division  regularly
receives  and  responds  to  customer  calls,  emails,  and  other
correspondence  concerning,  *inter  alia*,  product  defects.  Through
these  sources,  Toyota  was  made  aware,  or  reasonably  should  have
been  made  aware,  of  the  Defect.

137. Numerous  customer  complaints  from  numerous  sources
demonstrate  that  Toyota  knew,  or  reasonably  should  have  known,  of
the  problems  concerning  the  Defect,  the  costs  associated  with  the
necessary  repairs,  and  how  the  defective  condition  affects  its
consumers.

138.  Further,  Toyota  has  a  legal  obligation  pursuant  to
federal  law  to  monitor  defects  that  can  cause  a  safety  issue  and
report  them  within  five  (5)  days  of  learning  of  them.
Consequently,  Toyota  closely  monitors  the  NHTSA-ODI  website  and
the  complaints  filed  therein  in  order  to  comply  with  their

reporting obligations under federal law. Complaints on the NHTSA
website which may be related to this problem appear below:

**July 6, 2022** NHTSA ID NUMBER: 11472632
## Components: HYBRID PROPULSION SYSTEM, VEHICLE SPEED CONTROL
**NHTSA ID Number:** 11472632
**Incident Date** June 6, 2022
**Consumer Location** ROCKFORD, WA
**Vehicle Identification Number** N/A

### Summary of Complaint
CRASH**No**
FIRE**No**
INJURIES**0**
DEATHS**0**
The contact owns a 2020 Toyota Rav4 Hybrid. The contact stated while his mother was driving 45 MPH, the electronic throttle control system warning light illuminated. The vehicle was taken to the dealer to be diagnosed. The contact was informed that the MGR (Motor Generator Rear) system needed to be replaced. The vehicle was not repaired. The manufacturer was contacted and notified of the failure but offered no assistance. The contact was also informed that the vehicle was not covered under warranty. The approximate failure mileage was 53,000.

**May 5, 2022** NHTSA ID NUMBER: 11463470
## Components: UNKNOWN OR OTHER
**NHTSA ID Number:** 11463470
**Incident Date** May 4, 2022
**Consumer Location** BYRAM TOWNSHIP, NJ
**Vehicle Identification Number** JTMFB3FV5MD****

### Summary of Complaint
CRASH**No**
FIRE**No**
INJURIES**0**
DEATHS**0**
Vehicle abruptly and harshly slowed from 65mph to around 30 on the highway and multiple error lights and messages came up. After initial deceleration the vehicle seemed to drive normally. Once in a safe place to stop the vehicle was shut off and the only errors remained had been check engine and hybrid system malfunction and again the vehicle seemed to drive normally and was brought to the dealership for inspection

the next day on its own power. Errors seen in dash and Head Unit: brake power low, brake support system malfunction, check engine, hybrid system malfunction, park sensor malfunction, lane trace assist malfunction, sonar malfunction, headlight system malfunction. Dealership states they need to contact Toyota as there is something wrong and they are unsure what it is at this time.

1 Affected Product

☐ **Request Research** (Services fees apply)

**February 9, 2022** NHTSA ID NUMBER: 11451126
**Components: STRUCTURE, UNKNOWN OR OTHER, ENGINE**
**NHTSA ID Number:** 11451126
**Incident Date** January 20, 2022
**Consumer Location** CHARLOTTE, NC
**Vehicle Identification Number** JTMEB3FV8MD****

**Summary of Complaint**
CRASH**No**
FIRE**No**
INJURIES**0**
DEATHS**0**
Hello Nhtsa, It is a brand new car, while we were driving on the freeway, all off a sudden, we hard noisy drive, eventually smelled plastic. When we saw under the "Underbody plastic shield with clips loosen up" and it is handing half on the road. we were scared and it could even fire up the whole car as we smelled a burning smell. I called Toyota Custer service a couple of times and reported the issue. again called towing company took to the dealer. dealer "Town county Toyota Charlotte" Dealer manager was very rude and says it cannot be fixed, it is back-ordered, left us on the road to take out the car. It is such cheap material for Such an EXPENSIVE car. It has an 18KW battery and gas we would have been caught up in a fire in the car. We were so disappointed and shocked for a few days. # Again it is first in segment plugin EV. It makes weird noise occasionaly while reversing or staring going in 10-15miles per hour. Riased 2 service tickets with Toyota customer care, no response so far. First ticket: 220119002484 second ticket 220108001683

1 Affected Product

☐ **Request Research** (Services fees apply)

**January 15, 2021** NHTSA ID NUMBER: 11388255
**Components: ELECTRICAL SYSTEM, VEHICLE SPEED CONTROL, LANE DEPARTURE**
**NHTSA ID Number:** 11388255

**Incident Date** January 5, 2021

**Consumer Location** HURON, OH

**Vehicle Identification Number** 2T3E6RF30MW****

**Summary of Complaint**

CRASH No
FIRE No
INJURIES 0
DEATHS 0

1. CAR WOULDN'T START. LEFT STRANDED WITHOUT VEHICLE. 2. CRUISE CONTROL TURNED OFF AND WOULD NEVER TURN BACK ON FOR THE DURATION OF MY 30 MINUTE DRIVE. 3. THE CRUISE CONTROL ACCELERATED PAST THE SET LIMIT. IT WAS CHALLENGING TO GET IT TO STOP ACCELERATING. IT DIDN'T STOP RIGHT AWAY EITHER. SCARED ME TO DEATH. 4. INSTRUMENT PANEL WAS FLICKERING BRIGHT TO DIM CONSTANT AND THEN SETTLE AT DIM DURING DAYLIGHT HOURS IN THE BROAD DAYLIGHT. 5. PHONE CHARGER NOT WORKING PROPERLY. MY PHONE IS NOT MOVING AROUND EITHER. 6. THE ENTIRE RADIO SYSTEM WOULDN'T WORK. NO SOUND OR ANYTHING DURING MY ENTIRE DURATION OF DRIVE. 7. THE REMOTE START BARELY WORKS EVER BUT I CAN START ERICKS TRUCK. IT DOESN'T RECOGNIZE THE DOOR LOCK/UNLOCK MOST OF TIME EITHER. 8. LANE ASSIST SEEMS LIKE IT'S FIGHTING ITSELF. IT BASICALLY MAKES THE STEERING WHEEL SHAKEY FEELING WHEN IT'S ON AND BOUNCES BACK AND FORTH. 9. WHEN ANY IPHONE IS PLUGGED IN FLASHES BETWEEN CARPLAY TO REGULAR MODE EVERY 3-5 SECONDS. 10. RECEIVING MESSAGE THAT HYBRID BATTERY LOW.

## Safety Issue Type: Complaints

## July 20 2022 NHTSA ID Number: 11474983

## Components: ELECTRICAL SYSTEM

NHTSA ID Number 11474983

Incident Date July 05 2022

Consumer Location EAST SYRACUSE, NY

Vehicle Identification Number JTMDWRFV4KD******

## Complaint Summary

CRASH No
FIRE     No
INJURIES 0
DEATHS 0

I RECEIVED A NOTIFICATION OF A MALFUNCTION IN THE INTELLIGENT CLEARANCE SONAR SYSTEM AND A MALFUNCTION IN THE HYBRID SYSTEM. I MADE AN APPOINTMENT WITH THE DEALER BUT ON THE MORNING OF THE APPOINTMENT THE CAR WAS NON-OPERATIONAL IN THE DRIVEWAY AND HAD TO BE TOWED. THE DIAGNOSIS WAS CORROSION OF THE WIRING HARNESS. THIS PROBLEM HAS BEEN WIDELY REPORTED ON RAV4 HYBRID FORUMS AND APPEARS TO BE AN ISSUE IN REGIONS OF THE COUNTRY WITH SNOW/SALT ROAD TREATMENTS. I WOULD APPRECIATE AN INVESTIGATION.

## Affected Products (1)

### Vehicle

| MAKE | MODEL | YEAR |
|------|-------|------|
| TOYOTA | RAV4 | 2019 |

**139. Some of the complaints on the RAV4 World forum appear below:**

Are our hybrids plagued by cablegate affecting 5th gen hybrids?

High Voltage Cable Big Corrosion Problem
Hi 2019 rav4 hybrid with 80 000 miles on it! My car is 28 months old and Im leaving cold Canada. 2 weeks ago i got hybrid malfunction message. I did a inspection at the dealer! At the rear drive unit the wire is in really bad shape and Toyota dont want put on my hybrid 100 000 miles warrenty...
    www.rav4world.com

**internalaudit**
Registered

Joined Mar 31, 2015
891 Posts

 Discussion Starter · #2 · Apr 25, 2022 (Edited)
I usually read most of the posts on the first page and jump to the last page and read the discussion thread backwards.

Missed Posts # 16 and 17 (didn't get to those yesterday), both of which seem to confirm that the corresponding part on our 4th gen hybrid is located way way up.

Hopefully our vehicles aren't affected. So far, no check or hybrid system failure on my vehicle that's over six years and have 87k km on it.
2016 RAV4 Hybrid with Technology Package

**internalaudit**
Registered

Joined Mar 31, 2015
891 Posts

Discussion Starter · #3 · Apr 28, 2022

Underside from an old YT video. Looks like cabling is really that exposed. Just wondering why for the current gen, the MGR is more exposed to the elements.

2016 RAV4 Hybrid with Technology Package

**meeder**
Registered

Joined May 3, 2021
452 Posts

#4 · Apr 28, 2022

It looks a lot more protected on the 4th gen.

Reactions: internalaudit

**internalaudit**
Registered

Joined Mar 31, 2015
891 Posts

Discussion Starter · #5 · Apr 28, 2022

meeder said:
It looks a lot more protected on the 4th gen.

I wonder what led Toyota to change the design? Maybe to save on cable costs and shortening the run?

2016 RAV4 Hybrid with Technology Package

**meeder**
Registered

Joined May 3, 2021
452 Posts

#6 · Apr 28, 2022

internalaudit said:
I wonder what led Toyota to change the design? Maybe to save on cable costs and shortening the run?

Different design rear transaxle. The rear motor is smaller on the 5th gen but due to different gearing it delivers quite a lot more torque to the rear wheels.

I don't get the poor design of the 5th cable harness. It's like they have never thought of winter usage during the design phase.

#1,024 · May 29, 2022

Automender said:
I took my Rav4 in for service and asked for the connector to be inspected. They didn't do the inspection and said Tech Tip was not current. I gave a poor review and owner called me and we discussed the issue. He called Toyota rep and rep told him no use on inspecting because it will be corroded. It is just the amount of corrosion.

You took it in for regular service or only after you were made aware?

I think Toyota will not be able to shrug those who have complete Toyota service records for their vehicles.
2016 RAV4 Hybrid with Technology Package

Reactions: Glideslope

https://www.rav4world.com/threads/high-voltage-cable-big-corrosion-problem.318314/page-52

**140.  A sampling of posts regarding concerns by Venza Hybrid owners posted on the Toyota Nation website appear below:**

Next



**MTLGUY**
Registered
Joined Dec 29, 2021
10 Posts
Discussion Starter · #1 · Apr 22, 2022

I'm reading where some 2019-2020 RAV4 Hybrids are having an issue with corrosion or dirt build-up at the MGR connector and that this was not covered by Toyota if it was beyond the 3yr basic warranty, as they do not consider it part of the longer hybrid warranty, although it is clearly necessary for the hybrid to function.
I just want to know if anyone has any idea if it has occurred on newer Venza's, as they use the same hybrid system, or if Toyota has modified the part to stop this issue from happening.
I just purchased a 2022 Venza and I do not want this happening to me off the warranty down the road.

The Toyota tech tip mentioned is Tech Tip T-TT-0630-20 .

**schmidtj**
Registered

2021 Venza XLE, 2018 Prius Prime Advanced

Joined Jul 19, 2006
733 Posts
#2 · Apr 22, 2022

I can see Toyota's position on this. The MGR is the motor that drives the rear wheels. Toyotas have had occasional undercarriage corrosion issues for quite a while. At least 40 yrs. Best thing would be to keep your undercarriage as clean as possible.
I wonder if Toyota's Platinum Service Agreement would exclude this?

•

Reactions:Sparkland



**Quickdtoo**
Registered
Joined Apr 29, 2006
992 Posts
#3 · Apr 22, 2022

**EnjoyDriving**
Registered

Joined Jan 26, 2022
16 Posts
#4 · Apr 24, 2022
If you kneel down by the driver side rear wheel, you should be able to see part of that connector. Since Venza is lower than the Rav4, and i can see the connector more than theone on my RavP, I assume the same issue would exist and could be even worse. 🙁

#6 · Apr 26, 2022
Thomcat said:
Can't assume underside of a Rav4 hybrid is the same as a Venza hybrid....because it ain't. Air flow, splash resistance and underbelly cladding are all different. See:

Click to expand...

i took a pic of the plug, eventhough its totally out of focus, but you can tell it "should' be the same connector for the rear mg
Attachments
2021 Venza LE Blue

Joined Dec 23, 2021
297 Posts
#7 · May 4, 2022
I got a chance to take the photos of the plug while I was under car for Hitch install. Here are few photos. I did not like the fact how mud can accumulate in the pan there. Despite I only drove in snow on highway twice and did under carriage wash after coming back, there is mud/dirt in that pan. Also the coverage is not enough. They could have extended it so that splashing would not make it there.
#8 · May 4, 2022 (Edited)
Recent article about this in Canada. The cable arrangement is same as RAV4. It seems Toyota is not covering this issue under warranty even for cars with 60k miles and charging $4k for replacing it. What the damn cable costs $4k?
2021 Venza LE Blue

Joined Dec 23, 2021
297 Posts

#10 · May 4, 2022

Little more digging shows it is newer version of the connector, not same as 2019 RAV4 connector. This has back side open like this so that water and dirt is not held up in the pocket. Still I believe it should have been waterproof connector.

#14 · May 20, 2022

chinna said:

I got a chance to take the photos of the plug while I was under car for Hitch install. Here are few photos. I did not like the fact how mud can accumulate in the pan there. Despite I only drove in snow on highway twice and did under carriage wash after coming back, there is mud/dirt in that pan. Also the coverage is not enough. They could have extended it so that splashing would not make it there.

Thanks for the photos. What a terrible design, having such an important part completely exposed, especially under the car where rain and snow+salt slurry will splash in. Steel that's exposed like this will eventually rust and corrode whether the car is used in salted roads or not. Very disappointed in Toyota and expected more from such a reliable company. Was going to purchase a Venza or Rav4 Hybrid but will look elsewhere.

https://www.Toyotanation.com/threads/corrosion-on-hybrid-power-cable-in-2019-2020-rav4s-is-this-an-issue-with-21-22-venzas-also.1718282/

#113 · Feb 19, 2022

My husband also has a 2020 RAV4 Hybrid. 47k. Same corrosion problem. There's no way this is an issue of wear and tear. He washes the under carriage enough that this should not happen- especially with such a new car. Clearly it's a design issue and either it's made with faulty materials or needs better protection from the elements. Apparently Toyota is looking into it as there have been many identical complaints. We can only hope they will cover the 5k cost if it has to be replaced. If we replace it, what's stopping a new harness wire system from being a new problem in two years? I'd rather take it to our garage, have him repair it so that it functions and protect it Until Toyota hopefully comes up with a decent solution.

#122 · Feb 23, 2022

Das Momma said:

Toyota USA is covering $2000 of the $5000 repair. "As a good will gesture". But it will just happen again in another 2-3 years at the rate my husband puts on miles. So, then we will turn around and by a warranty from them for 60k additional miles. The cost? About $2500.

"As a good will gesture" - meaning they officially denied it as a warranty covered item then. That sucks, and if that's the case, it won't be covered by the extended warranty either, correct? And what's their explanation on the non-coverage? This would be a nightmare for those who live in snowy area.

132 · Feb 23, 2022

Toyota should be modifying or upgrading these connectors under warranty or recall. Toyota has no issue replacing gen 1 or 2 Tacoma chassis' to the tune of $12000 due to corrosion. This is no different. It is obviously a design flaw that will affect many if not all Rav4 H operated in areas prone to corrosion. I live in the rust belt and plan on inspecting my 2020 model in spring when weather permits. Replacing a complete HV wiring harness on a couple year old vehicle to the tune of $5000 for the sake of a corroded $20 connector is absolutely ludicrous.

https://www.rav4world.com/threads/high-voltage-cable-big-corrosion-problem.318314/page-7

#385 · Apr 5, 2022

So I put it through Google Translate. I guess they won't even give you a new cable as a preventive measure. They'll only replace the cable if you have the issue during the 3 year period. After that no coverage. So if you have a rusty cable but no codes Toyota can run the clock out on you even though they are acknowledging a design defect (since they have a new connector cover to mitigate this issue). If I knew how I'd probably cut away that section of cover.

APPLICABLE WARRANTY
• The Toyota Base Warranty covers this repair. This warranty is in effect for
36 months from the date of vehicle warranty registration or 60,000 kilometres,
whichever comes first.
• The application of the warranty is limited to the occurrence of the specified condition described in the
this newsletter.

#392 · Apr 6, 2022

Lv4toys said:

> I don't understand why the high voltage cable is not considered part of the hybrid system… it's not on the gas models. Hmmmmmm,…..

I thought a way around would be to get extended coverage and buy the platinum warranty but when you look at the details, many of the hybrid components are covered by the hybrid warranty. We now know the hybrid warranty doesn't cover this part (a vulnerable part). Does anyone know what hybrid components aren't covered by the hybrid warranty or the platinum warranty? Toyota leads you t believe that for the hybrid components, the battery is covered for 10 years and the rest of the hybrid components 8 years. Very misleading. I'd like to see a list of hybrid components that aren't covered and even then if they are Toyota could always say rust voids the coverage.

Reactions: crazyhorse

https://www.rav4world.com/threads/high-voltage-cable-big-corrosion-problem.318314/page-20

**141. Several Lexus owners are also complaining online about this problem or the potential for this problem:**

Am I correct in assuming the current Lexus NX hybrids use the same high-voltage connection to the rear drive units that recent Rav4 hybrids use (Im still waiting for delivery of my 350h)? In which case we can expect the serious corrosion issues some Rav4 owners have in that component will eventually also affect the NX hybrid models?

There is a massive thread about this at https://www.rav4world.com/threads/hi...roblem.318314/ and the half-assed modification to the plastic covering Toyota implemented last year isn't looking like it will be of much help preventing the corrosion. Sufficient corrosion in this area will make the vehicle inoperable and require replacement of that entire high-voltage wiring harness potentially at major expense since it is covered only by the basic warranty (not part of hybrid coverage

according to Toyota). Perhaps most concerning is Toyota's poor response thus far to the issue (hence the class action lawsuit currently happening in Canada). The issue will be of most concern to owners in those parts of Canada and the US where the roads are heavily salted in winter.



07-12-22, 01:37 PM                                                                        #2

**lesz**
Lead Lap

Join Date: Aug 2013
Location: Illinois
Posts: 4,260
Likes: 107
Received 974 Likes on 674 Posts

It would appear that the issue with the RAV4 Hybrid primarily has appeared on vehicles used in areas where salt has been used on roads during the winter, including the northern parts of the US and Canada. It also appears that, before the corrosion of the cable caused problems, the vehicles were exposed to those conditions for 2 or more years. Most of the vehicles with the failed component seem to be from model years 2019 and 2020. I suspect that, in the next year or so, we will be seeing 2021 RAV4 hybrid vehicles with the same cable failure.
Since the NX Hybrid shares so many of its components with the RAV4 Hybrid, I can only assume that it is using the same cable as the RAV4 Hybrid. With the NX Hybrid first becoming available for the 2022 model year, I would be surprised if there are already any examples of that cable failing, but I won't be surprised to see examples of the cable failure starting to emerge in the next couple of years.

**gcskoor**
Driver

Join Date: Feb 2022
Location: CoLORADO
Posts: 99
Likes: 61
Received 23 Likes on 19 Posts

I would like to see some pics or a reference of new parts over the 2021 Rav4 also vs part# for the NX. If it one if so certain, I would then to think they could share how it is known or or documentation to show the updated design for the NX.

From what I can see from under the NX, it looks just like the Rav4 2021 hybrid pics. The cable attached upside down with a short curve of the cable going back into the top of the car. It seems to have the same underbody hard plastic covering pan like other Rav4 hybrids

also. I am not how new or if this pan has always been there or is part of the 2021 fix.

There may be, of course, some better connector improvements that are hard to see. I did not feel comfortable putting my hand on the back side to feel if it has the same cutout fix for drainage of the new connector. I assume yes, since it is a Japan 6/22 build date.

I drive in Colorado and we tend to not have much rust or corrosion issues, so I am not likely to see the issue as in other areas. I suspect most of the damage was the collection of the road salts been keep in a ionic solution by the lack of drainage. Just having the drainage cutout and the road cover probably reduces this to a manageable level. Not a chemist, but if the road salts are dried there should just be typical atmosphere humidity for a chemical reaction to take place - i.e. very little to almost none in Colorado. And normal rain driving should wash some of it out with the same action that put the road salts on the connector in the first place. I guess look for rain puddle. LOL

Originally Posted by **gcskoor** ▶

*When I was doing some research on this issue, I saw some pics of the new connector with the large cutout on the back side of the connector. It def will drain and not break open by the water freezing in it again. It seems Toyota's engineers think that cutout and with the pan cover is enough. I hope so.*

From doing lots of reading about this issue, it appears that the "cutout" is just the removal of a portion of the original cover, and that is what Toyota is doing with RAV4 Hybrids that are now in production.

But it also appears that this is just a temporary fix and that Toyota is supposedly working on a more permanent fix. Owners of the RAV4 Hybrid with that temporary fix report that it slows the development of the corrosion, but it does not stop it from occurring.

For those who want to spend some/lots of time reading, just about everything that is known about the issue, what Toyota is or is not doing, and what some owners are doing themselves is in a now 83 page long thread on the RAV4 World forums.

https://www.clublexus.com/forums/nx-2nd-gen-2022-current/988814-will-the-rav4-hybrid-high-voltage-corrosion-issue-affect-the-nx-hybrid-models.html

https://www.rav4world.com/threads/hi...roblem.318314/

## 142. A smattering of complaints posted on the online Torque

## website are listed below:

# Comments

**Jean-Thomas Landry** wrote on March 23, 2022 - 10:41am**Permalink**
I have same problem at 127000km! $$$ rav4 2019

- **reply**

**Hugo-S. Aubert** wrote on March 23, 2022 - 11:11am**Permalink**
I've started to use #plugate or #Toyotaplugate in certain posts. Feel free to use it ! Thanks again !

- **reply**

**Michel Paul Cote** wrote on April 6, 2022 - 4:22pm**Permalink**
It made the national newspaper in Montreal today.(lapresse+l. Over 300 failures in Quebec, and Toyota refuses to cover under the 8 year warranty. They claim it is not part of the drivetrain. Cost of repair is 7500$. Transport Canada is looking into the matter. Not a great customer service approach

from Toyota. Had issues with the front seat not heating, no way to tow the car, and now this. After 8 Toyotas, it might be my last one.

- reply

**Jim young wrote on April 15, 2022 - 5:47pm**Permalink

I have a 2019 Toyota rav4 hybrid with 95000 km on it, got a hybrid malfunction warning, took it to Toyota dealer in Barrie Ontario, wire harness shows corrosion, dealer and Toyota say it is not covered by any warranty and with cost me $8000.00 to repair.

- reply

**Margaret J Kaufman wrote on April 26, 2022 - 9:11pm**Permalink

Our 2019 RAV4 Hybrid had the corrosion of the wiring harness at 60,000 miles. Toyota stated that the part is not covered by warranty. We paid $4000 to have it repaired.

- reply

**Hugo wrote on April 30, 2022 - 7:54am**Permalink

Please write to us as we try to gather the most information about this mess Toyota is not willing to handle as of now !!! Toyotacablegate@gmail.com

- reply

**Liam Doherty wrote on May 8, 2022 - 9:52am**Permalink

2020 Rav4 hybrid with 40,000kms. Car just stopped and gave me a "hybrid system malfunction. Visit your dealer." After 5 minutes the car would start, run in gas only. Got it to the dealer. They said don't drive it as it could go into 'limp mode' without warning, dropping me down to 15kmh on the highway in a heartbeat. Backorder of the part is at least a month. They have no idea. But it's under warranty for me.

- reply

**Gord wrote on May 20, 2022 - 7:58am**Permalink

My 2021 Rav4 hybrid has been sitting at the dealer for 3 weeks. They claim Toyota can not give them a delivery date on the wiring harness but acknowledge it will not be soon. At least one other hybrid sitting on the lot with the same issue. Toyota paying for a rental.

- reply

**Amy wrote on May 24, 2022 - 3:23pm**Permalink

Did they tell you not to drive it? Mine just said that it should be fine to drive until the part comes in. There are currently almost 300 of them backordered. I really need my car back but kind of worried about driving it.

- reply

**Peggy Kaufman wrote on May 25, 2022 - 9:01am**Permalink

I was told not to drive it. If the wiring harness is corroded, it seems like it would endanger the rest of the electrical system. Toyota did not assist me in any way as I waited a month for repairs.

- reply

**Wayne Groves wrote on June 3, 2022 - 10:39am**Permalink

2019 Rav 4 with 27000 km sitting on dealer's lot. Latest from Toyota is 3 months for wiring harness. Gets extended a month every time I call.

- reply

**Kate wrote on June 8, 2022 - 1:29pm**Permalink

Got "hybrid malfunction" error on 2019 model at 34k. Took 1.5 weeks to get an appointment at VT Toyota dealership, told it was the harness corrosion issue, 3 weeks post identification and still waiting on a part with no updates. Was told by service tech it would be covered by warranty however won't believe it until I see it. Was also told not to drive it, as it could stop driving at any time. It took Toyota 1.5 weeks to find a rental, but they are covering the rental cost.

- reply

**Jim Berrigan wrote on June 30, 2022 - 8:18pm**Permalink

How much is a new cable that doesn't have the corrosive problem. I am Willing to buy the cable to prevent this meltdown of other electrical components. I have corrosion on the cable and Toyota won't cover shit so if I New the cost of the cable I might have a chat with them.

- reply

**John Pavel wrote on July 11, 2022 - 2:29pm**Permalink

I'm living this issue right now. Toyota agreed to supply the part at their cost, but I must pay the labor. Says the reason is rust and thats why its not fully covered. I live in Cleveland, it snows! I have my rav for 24 months...does that mean I can expect the same issue 24 months after is replaced?

- reply

**Kris Rexroad wrote on July 21, 2022 - 7:43pm**Permalink

2019 rav 4 hybrid 40 000 miles cortisone on battery. 3800. Repai bill 2450 for the harness rest in labor

- reply

**Carmel McColgan wrote on July 25, 2022 - 3:41pm**Permalink

I have the same problem on my 2019 RAV4 Limited Hybrid. Alert stated, "Malfunction in the Hybrid System" but the wiring harness is not covered under the hybrid warranty. It will cost me ~$5300 for repair. Car has 51k miles, less than 3 years old. And no idea when the part will come in.

- reply

**Jean-Thomas Landry wrote on July 27, 2022 - 7:50am**Permalink

Your not alone! Join our groupe on facebook towards a recall - rav4/prime cablegate Good luck

- reply

**Mary wrote on August 23, 2022 - 7:48pm**Permalink

August 2022: We received a warning message that our RAV4 hybrid system malfunctioned. We took it to our dealer. They contacted Toyota and Toyota covered the repair fully ($4,000) and the car was repaired quickly. A great response from Toyota.

143. Toyota had exclusive knowledge of and/or concealed material information about the Defect and failed to disclose the Defect to Plaintiffs and other class members in any pre-sale materials and during any service visits—the time at which Plaintiffs and other class members could have acted. Toyota had exclusive knowledge of and/or actively concealed the truth about the existence and nature of the Defect from Plaintiffs and other class members at all times, even though Toyota knew about the Defect and knew that information about the Defect would be important to a reasonable consumer.

144. Had Toyota disclosed the truth, Plaintiffs (and reasonable consumers) 1) would have paid less for the Class Vehicles, 2) would not have purchased or leased the Class Vehicles

at all, or 3) would have brought their Class Vehicles in for service during the warranty period.

145. Toyota, like all automakers, is under a duty to disclose a known defect in a vehicle when there are safety concerns associated with the vehicle's use — *i.e.*, where the failure to disclose implicates a safety issue. Manufacturers may be held liable for their failure to disclose a defect when such an omission pertains to a safety issue. In this case, as stated above, Toyota knew about the Defect, and that the Defect could pose a physical threat to Plaintiffs' own safety or the safety of others. Nevertheless, Toyota failed to disclose the Defect to all owners or lessees of the Class Vehicles.

146. Based on the above, Toyota knew of the Defect at the time it sold or leased the Class Vehicles, and the potential danger it posed to consumers.

147. Based upon all the foregoing, Toyota was aware of the Defect when it began warranting, advertising, promoting, marketing, distributing, selling and leasing the Class Vehicles, and repairing the Class Vehicles, yet failed to take any remedial action.

148. Despite all of the foregoing, Toyota has refused to address and rectify the Defect, and has failed and refused to reimburse its customers for the monies they were forced to expend, and are continually forced to expend, as a direct and proximate

result of the Defect.  Toyota has failed to implement a plan to address the Defect, and has instead manufactured, warranted, advertised, promoted, marketed, distributed, sold and leased subsequent models that contain the same or substantially similar Defect, which they actively and intentionally concealed.

149. Buyers, lessees and other owners of the Class Vehicles were without access to the information concealed by Toyota as described herein, and therefore reasonably relied on Toyota's representations and warranties regarding the quality, durability, and other material characteristics of the Class Vehicles. Had these buyers and lessees not been purposely deceived by Toyota regarding their vehicles and the known defects within them, Plaintiffs and the other members of the Class would have paid less for their vehicles than the amounts they actually paid, or would not have purchased or leased the vehicles at all.

D. <u>Toyota's Warranty</u>

150. Toyota issued several different warranties to each owner or lessee of the Class Vehicles, some of which are relevant to this Defect.

151. The Basic Coverage Warranty, or bumper-to-bumper warranty is for 3 years or 36,000 miles whichever comes first.

152. The Powertrain Warranty is supposed to cover the parts of the vehicle that make the car move, including the engine,

transmission, drive axels and related parts and is for 5 years or 60,000 miles whichever comes first.

153. The Hybrid Battery Warranty for 2020 and newer models went from 8 years or 100,000 miles to 10 years or 150,000 miles, whichever comes first. This warranty is supposed to cover issues with the hybrid battery, electric drivetrain system or other hybrid related components.

154. Toyota instructs owners and lessees to bring their vehicles to a Toyota dealership for warranty repairs.

155. Many owners and lessees have presented the Class Vehicles to Toyota dealerships with complaints related to the Defect. Toyota has evaded its warranty obligations by failing to inform owners and lessees of the Class Vehicles of the existence of the Defect and then refuses to cover the defect under the applicable warranties. Even though owners and lessee have seen a message on their dashboard or entertain screen indicating that they are experiencing a "hybrid system failure" and this code appears when the technician looks for codes, Toyota continues to assert that the cable is not part of the hybrid system and covered by that longer warranty.

156. In many if not most instances the Defect does not manifest until after the expiration of the basic coverage warranty and Toyota refuses to provide warranty coverage under the

powertrain or hybrid related components warranty although Toyota is well aware that corrosion will not happen that quickly.

157. Owners and lessees of the Class Vehicles have incurred, and will continue to incur, expenses for the diagnosis and repair of the Defect, despite such Defect having been contained in the Vehicles when manufactured, distributed, advertised, marketed, and warranted by Toyota.

## VI. CLASS ACTION ALLEGATIONS

158. Plaintiffs bring this action on behalf of themselves and all other persons similarly situated, pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following class and subclass (collectively, the "Classes"):

### The Nationwide Class

All persons or entities in the United States who own, lease, or have owned or have leased, a Toyota RAV4 Hybrid AWD or RAV4Prime AWD for model years 2019 – present, Toyota Highlander Hybrids AWD for model year 2020, 2021 and 2022, Venza Hybrid AWD vehicles from 2021 and 2022, and  LEXUS NX350h AWD for 2021 and 2022 and NX450H AWD plug in Hybrid for 2022, as well as any other Toyota/Lexus model containing the Defect.

### The New Jersey Subclass

All persons or entities in New Jersey who own, lease, or have owned or have leased, a Toyota RAV4 Hybrid AWD or RAV4Prime AWD for model years 2019 – 2022, Toyota Highlander Hybrids AWD for

model year 2020, 2021 and 2022, Venza Hybrid AWD vehicles from 2021 and 2022, and  LEXUS NX350h AWD for 2021 and 2022 and NX450H AWD plug in Hybrid for 2022, as well as any other Toyota/Lexus model containing the Defect.

### The New York Subclass

All persons or entities in New York who own, lease, or have owned or have leased, a Toyota RAV4 Hybrid AWD or RAV4Prime AWD for model years 2019 – present, Toyota Highlander Hybrids AWD for model year 2020, 2021 and 2022, Venza Hybrid AWD vehicles from 2021 and 2022, and  LEXUS NX350h AWD for 2021 and 2022 and NX450H AWD plug in Hybrid for 2022, as well as any other Toyota/Lexus model containing the Defect.

### The Pennsylvania Subclass

All persons or entities in Pennsylvania who own, lease, or have owned or have leased, a Toyota RAV4 Hybrid AWD or RAV4Prime AWD for model years 2019 to the present, Toyota Highlander Hybrids AWD for model year 2020, 2021 and 2022, Venza Hybrid AWD vehicles from 2021 and 2022, and  LEXUS NX350h AWD for 2021 and 2022 and NX450H AWD plug in Hybrid for 2022, as well as any other Toyota/Lexus model containing the Defect.

### The Maryland Subclass

All persons or entities in Maryland who own, lease, or have owned or have leased, a Toyota RAV4 Hybrid AWD or RAV4Prime AWD

for model years 2019 to the present, Toyota Highlander Hybrids AWD for model year 2020, 2021 and 2022, Venza Hybrid AWD vehicles from 2021 and 2022, and  LEXUS NX350h AWD for 2021 and 2022 and NX450H AWD plug in Hybrid for 2022, as well as any other Toyota/Lexus model containing the Defect.

### The Tennessee Subclass

All persons or entities in Tennessee who own, lease, or have owned or have leased, a Toyota RAV4 Hybrid AWD or RAV4Prime AWD for model years 2019 to the present, Toyota Highlander Hybrids AWD for model year 2020, 2021 and 2022, Venza Hybrid AWD vehicles from 2021 and 2022, and  LEXUS NX350h AWD for 2021 and 2022 and NX450H AWD plug in Hybrid for 2022, as well as any other Toyota/Lexus model containing the Defect.

### The Idaho Subclass

All persons or entities in Idaho who own, lease, or have owned or have leased, a Toyota RAV4 Hybrid AWD or RAV4Prime AWD for model years 2019 -2022, Toyota Highlander Hybrids AWD for model year 2020, 2021 and 2022, Venza Hybrid AWD vehicles from 2021 and 2022, and  LEXUS NX350h AWD for 2021 and 2022 and NX450H AWD plug in Hybrid for 2022, as well as any other Toyota/Lexus model containing the Defect.

### Excluded from all Classes

Excluded from the Classes are: (a) Defendants, any entity in which Defendants have a controlling interest, and its legal

representatives, officers, directors, employees, assigns, and successors that purchased the Class Vehicles; (b) the judge to whom this case is assigned and any member of the judge's immediate family; and (c) individuals with claims for personal injury, wrongful death and/or emotional distress.

159. **Numerosity/Impracticability of Joinder**: The members of the Class are so numerous that joinder of all members would be impracticable. The Class is believed to include tens of thousands of members. The Class is composed of an easily ascertainable, self-identifying set of individuals and entities that own, lease or owned and leased the Class Vehicles. The precise number of Class members can be ascertained by reviewing documents in Defendants' possession, custody, and control.

160. **Commonality and Predominance**: There are common questions of law and fact that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, include, but are not limited to, the following:

      a. Whether the Class Vehicles suffer from the Defect;
      b. Whether the likelihood of corrosion in the connection for the high voltage wire harness rendering the MGR subject to a short constitutes a material fact;

      c. Whether Toyota knew, or reasonably should have known, that the Class Vehicles were defectively designed, manufactured, marketed, distributed, advertised, warranted, sold, leased, and serviced;

      d. Whether Toyota knew or reasonably should have known of the Defect before it sold and leased the Class Vehicles to Plaintiffs and the other members of the Class;

e. Whether Toyota had a duty to disclose the Defect to Plaintiffs and the other members of the Class;

f. Whether Toyota actively and intentionally concealed, failed to disclose and/or omitted material information in its marketing, advertising, sale and lease of the Class Vehicles concerning the existence of the Defect;

g. Whether Toyota actively and intentionally concealed, failed to disclose and/or omitted material information when repairing the Class Vehicles concerning the existence of the Defect;

h. Whether Plaintiffs and the other members of the Class are entitled to equitable relief, including but not limited to a preliminary and/or permanent injunction requiring Toyota to institute a recall and/or pay for all repairs resulting from the Defect under the powertrain or hybrid component warranty or otherwise extend the basic warranty to cover the repairs;

i. Whether Toyota should be declared financially responsible for notifying all members of the Class of the Defect in the Class Vehicles, and for the costs and expenses of repairing the Defect;

j. Whether Toyota is obligated to inform members of the Class of their right to seek reimbursement for having paid for repairs or engine replacement due to the Defect;

k. Whether Toyota violated the consumer protection laws in the New Jersey Consumer Fraud Act (hereinafter, the "CFA"), N.J.S.A. 56:8-1, et seq., and/or the consumer protection laws of the states involving Subclass members.

l. Whether Toyota's conduct violates warranty laws, and other laws as asserted herein;

m. Whether, as a result of Toyota's omissions and concealments of material facts related to the Defect, Plaintiffs and the other members of the Class have suffered ascertainable losses, and whether Plaintiffs and the other members of the Class are entitled to monetary damages and/or other remedies, and if so the nature of any such relief;

n. Whether Plaintiffs and the other members of the Class are entitled to recover the diminution in value caused by the Defect;

o. Whether Toyota's acts and/or omissions entitle Plaintiffs and the other members of the Class to treble damages, attorneys' fees, prejudgment interest and cost of suit.

161. <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and the other members of the Class have suffered similar injury by the same wrongful practices by Toyota. The claims of Plaintiffs and the other members of the Class all arise from the same wrongful practices and course of conduct, and are based on the same legal and remedial theories.

162. <u>Adequacy Of Representation</u>: Plaintiffs will fully and adequately assert and protect the interests of the members of the Class, and have retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiffs nor their attorneys have any interests that are contrary to or conflicting with the members of the Class.

163. <u>Superiority Of Class Action And Impracticability Of Individual Actions</u>: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all members of the Class is not economically feasible and is procedurally impracticable. While the aggregate damages sustained by the

members of the Class are in the millions of dollars, and are no less than five million dollars, upon information and belief, the individual damages incurred by each member of the Class resulting from Toyota's wrongful course of conduct are too small to warrant the expense of individual suits. The likelihood of individual members of the Class prosecuting their own separate claims is remote, and, even if every Class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Individual members of the Class do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and to the court system because of multiple trials of the same factual and legal issues. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. In addition, Toyota has acted or refused to act on grounds generally applicable to the members of the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate.

## VII. CLAIMS FOR RELIEF

### FIRST COUNT -- OMISSION

### Violations of New Jersey's Consumer Fraud Act, N.J.S.A. § 56:8-2, et seq.

**(By All Plaintiffs on Behalf of the Nationwide Class, or Alternatively, By Plaintiffs Isenberg and DelliSanti on behalf of the New Jersey Class)**

164. Plaintiffs on behalf of themselves and all others similarly situated, incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

165. This claim is brought on behalf of the Nationwide Class or alternatively on behalf of Isenberg and DelliSanti on behalf of the New Jersey Class.

166. Toyota has engaged in deceptive, unconscionable, unfair, fraudulent and/or misleading commercial practices in the advertising, promoting, marketing, distributing, selling and leasing of the Class Vehicles it knew to be defective.

167. Toyota intentionally omitted the fact that its goods, merchandise and/or services did not have characteristics, uses, benefits, or quantities that were advertised and promoted, and

failed to disclose that its goods, merchandise and/or services were not of a particular standard, quality or grade.

168. Toyota had a duty to Plaintiffs and the Nationwide Class to disclose the defective nature of the Class Vehicles and the Defect because:

a. Toyota was in a superior position to know the true state of facts about the Defect and repair costs in the Class Vehicles;

b. Plaintiffs and the Nationwide Class could not reasonably have been expected to learn or discover that the Class Vehicles had a dangerous safety defect until after manifestation of the Defect;

c. Toyota knew that Plaintiffs and the Nationwide Class could not reasonably have been expected to learn or discover the Defect and the associated repair costs until the manifestation of the Defect.

169. In failing to disclose the Defect and the associated risks and repair costs, Toyota undertook active and ongoing steps to intentionally conceal the Defects, and has concealed, failed to disclose and/or omitted material facts from Plaintiffs and other members of the Nationwide Class and New Jersey Subclass with respect to the Defect in the Class Vehicles.

170. Toyota intended that Plaintiffs and the other members of the Nationwide Class and New Jersey Subclass would rely upon its

acts of concealment and/or omission by purchasing or leasing the Vehicles at full price rather than paying less to purchase or lease the Class Vehicles, or purchasing or leasing other vehicles.

171. Toyota intended that Plaintiff and the other members of the Nationwide Class and New Jersey Subclass would rely upon its acts of concealment and/or omission to avoid replacing the defective parts during the warranty period.

172. Toyota's omissions were objectively deceptive and had the capacity to deceive reasonable consumers under the circumstances. The fact that Toyota knew about and failed to disclose that the Defect in the Class Vehicles was a material fact that a reasonable and/or unsophisticated consumer would attach importance to at the time of purchase or lease. This fact would influence a reasonable consumer's choice of action during the purchase or lease of a vehicle.

173. Such practices contravene the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et seq.

174. As a direct and proximate result of Toyota's violations of the NJCFA, Plaintiffs and the other members of the New Jersey Subclass and Nationwide Class have suffered ascertainable losses, which include but are not limited to, the monies they were forced to expend — and will have to expend in the future — to repair and/or replace their vehicles' high voltage cable and associated parts, the diminished value of their vehicles, and the failure to

receive the benefit of their purchases or leases, and accordingly were harmed by Defendants' actions in violation of the NJCFA.

### SECOND COUNT – OVER CHARGING

#### (Violations of New Jersey's Consumer Fraud Act, N.J.S.A. § 56:8-2, et seq.)

**(By All Plaintiffs on Behalf of the Nationwide Class, or Alternatively, By Plaintiffs Isenberg and DelliSanti on behalf of the New Jersey Class)**

175. Plaintiffs, on behalf of themselves and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

176. This claim is brought on behalf of the Nationwide Class or alternatively on behalf of Isenberg and DelliSanti on behalf of the New Jersey Subclass.

177. Toyota has engaged in deceptive, unconscionable, unfair, fraudulent and/or misleading commercial practices in the advertising, promoting, marketing, distributing, selling and leasing of the Class Vehicles at a premium price despite knowing that they were defective.

178. Toyota charged a premium for the Class Vehicles, despite knowing that its goods, merchandise and/or services had characteristics, uses, benefits, or quantities that they did not

have, and that its goods, merchandise and/or services were of a particular standard, quality or grade that they were not.

179. In its advertising, promoting, marketing, distributing, selling and leasing of the Class Vehicles, Toyota undertook active and ongoing steps to charge a premium price for the Class Vehicles while intentionally concealing the Defect, and has consciously concealed, failed to disclose and/or omitted material facts from Plaintiffs and other members of the New Jersey Subclass and Nationwide Class with respect to the Defect.

180. Toyota intended that Plaintiffs and the other members of the New Jersey Subclass and Nationwide Class would rely upon its acts of concealment and/or omission by purchasing or leasing the Class Vehicles at premium price rather than paying less to purchase or lease the Class Vehicles, or purchasing or leasing other vehicles.

181. Toyota's conduct was objectively deceptive and had the capacity to deceive and defraud reasonable consumers under the circumstances. The fact that Toyota knew about and failed to disclose the Defect was a material fact that a reasonable and/or unsophisticated consumer would attach importance to at the time of purchase or lease. This fact would influence a reasonable consumer's choice of action during the purchase or lease of a vehicle.

182. Such practices contravene the New Jersey Consumer Fraud Act, <u>N.J.S.A.</u> 56:8-1, et seq.

183. As a direct and proximate result of Toyota's violations of the NJCFA, Plaintiffs and the other members of the Nationwide Class and New Jersey Subclass have suffered ascertainable losses, which include but are not limited to, the premium price the Nationwide Class and New Jersey Subclass paid for the Class Vehicles, the monies they were forced to expend — and will have to expend in the future — to repair and/or replace the hybrid cable and associated parts, the diminished value of their vehicles, and the failure to receive the benefit of their purchases or leases, and accordingly were harmed by Defendants' actions in violation of the NJCFA.

<u>THIRD COUNT-VIOLATIONS OF THE TRUTH-IN-CONSUMER CONTRACT, WARRANTY AND NOTICE ACT</u>
(N.J.S.A. 56:12-15)

By Plaintiffs Isenberg and DelliSanti on behalf of the New Jersey Class)

184. Plaintiffs, Isenberg and DelliSanti, on behalf of themselves and the New Jersey Subclass, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

185. This claim is brought on behalf of the New Jersey Subclass.

186. Plaintiff and those similarly situated are "consumers" within the meaning of TCCWNA, as set forth at N.J.S.A. 56:12-15.

187. Defendants are sellers within the meaning of TCCWNA, as set forth at N.J.S.A. 56:12-15 and -17.

188. TCCWNA, at N.J.S.A. 56:12-15, provides in relevant part that "no seller, creditor, lender or bailee may offer or enter into any written consumer contract or give or display any notice which includes any provision that violates a clearly established right of the consumer or responsibility of the seller, lessor, creditor, lender or bailee as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed."

189. By violating the CFA, and a clearly established legal right of a consumer and/or responsibility of the seller to not engage in any misrepresentations, deception, or unconscionable commercial conduct in connection with consumer sales as detailed in this Complaint, Defendants thereby violated the Truth-in-Consumer Contract, Warranty and Notice Act, N.J.S.A. 56:12-14 et seq.

190. As the result of Defendants' violations of TCCWNA, Plaintiffs and the Class Members are entitled to statutory damages of not less than $100 each as provided by N.J.S.A. 56:12-17.

## FOURTH COUNT-COMMON LAW FRAUD

72

(By All Plaintiffs on Behalf of Nationwide Class or,
Alternatively, on Behalf of the State Subclasses)

191. Plaintiffs, on behalf of themselves and all others similarly situated, incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

192. This claim is brought on behalf of the Nationwide Class or alternatively the State Subclasses.

193. Toyota consciously and intentionally concealed, failed to disclose and/or omitted a material presently existing or past fact. For example, Toyota did not fully and truthfully disclose to their customers the presence of the Defect. As a result, Plaintiffs and the other members of the Nationwide Class or State Subclasses were fraudulently induced to purchase or lease Class Vehicles containing the Defect and to pay for numerous repairs to Class Vehicles containing the Defect.

194. These concealments and/or omissions were intentionally made by Toyota with knowledge of their falsity, and with the intent that Plaintiffs and the other members of the Nationwide Class or State Subclasses would rely upon them.

195. Plaintiffs and the other members of the Nationwide Class or State Subclasses reasonably relied on Toyota's concealments and/or omissions, and suffered damages as a result.

### FIFTH COUNT-BREACH OF EXPRESS WARRANTY

(By All Plaintiffs on Behalf of Nationwide Class or,
Alternatively, on Behalf of the State Subclasses)

196. Plaintiffs, on behalf of themselves and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

197. This claim is brought on behalf of the Nationwide Class of alternatively on behalf of the State Subclasses.

198. Toyota provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the bargain.

199. Accordingly, Toyota warranties are express under state law.

200. The components that must be repaired and/or replaced as a result of the Defect, as well as the other damages caused as a result of the Defect, as described herein, are covered by the express warranties Toyota provided all purchasers and lessors of the Class Vehicles.

201. Plaintiffs and the other members of the Nationwide Class have complied with all obligations and requirements under the Class Vehicles' express warranties or are otherwise excused from performance of said obligations and requirements.

202. Toyota breached these warranties by selling and leasing Class Vehicles which they knew, or reasonably should have known, contained the Defect and required repair or replacement within and outside the applicable warranty periods, and/or refused to honor

the warranties by providing free repairs and/or replacements during the applicable warranty period or periods or after the warranty expired, which is when the Defect typically manifested.

203. Plaintiffs notified Toyota of the breach within a reasonable time, and/or was not required to do so because affording Toyota a reasonable opportunity to cure its breach of written warranty would have been futile. Toyota also knew of the Defect and yet chose to conceal it and to not comply with their warranty obligations.

204. As a direct and proximate result of Toyota's breach of the Class Vehicles' express warranties, Plaintiffs and the other members of the Nationwide Class were damaged by, among other things, being forced to expend monies — and will continue to be forced to expend monies — to repair and/or replace their vehicles' components, and diminution in value of their vehicles.

205. Toyota's attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Toyota's warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the Defect and in most instances the Defect does not manifest itself until after the express warranty expires.

206. The time limits contained in Toyota's warranty period were also unconscionable and inadequate to protect Plaintiffs and

members of the Nationwide Class. Among other things, Plaintiffs and the other members of the Nationwide Class had no meaningful choice in determining these time limitations the terms of which unreasonably favored Toyota. A gross disparity in bargaining power existed between Toyota and Plaintiffs and the Nationwide Class, and Toyota knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives. Further, given the nature of the Defect it should be covered by the Hybrid Component Warranty and/or the Power Train Warranty but Toyota has refused to cover these expensive repairs under these warranties.

207. Plaintiffs and members of the Nationwide Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Toyota's conduct described herein.

### SIXTH COUNT- BREACH OF IMPLIED WARRANTY

**(By All Plaintiffs on Behalf of Nationwide Class or, Alternatively, on Behalf of the State Subclasses)**

208. Plaintiffs, on behalf of themselves and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

209. This claim is brought on behalf of the Nationwide Class or alternatively on behalf of the State Subclasses.

210. Toyota was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Toyota knew, or reasonably should have known, of the specific use for which the Class Vehicles were purchased or leased.

211. Toyota provided Plaintiffs and the other members of the Nationwide Class with an implied warranty of merchantability that the Class Vehicles, and any components thereof, are merchantable and fit for the ordinary purposes for which they were sold or leased.

212. Toyota impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty of merchantability included, among other things: (1) a warranty that the Class Vehicles, and the engines and hybrid parts required for operation were manufactured, supplied, distributed, sold and/or leased by Toyota were safe and reliable for providing transportation, and would not experience loss of power while driving; the inability to use the hybrid battery or experience other faults in the radio or other parts as a result in a short in the MGR due to corrosion, and (ii) a warranty that the Class Vehicles would be fit for their intended use while the vehicles were being operated.

213. Contrary to the applicable implied warranties of merchantability, the Class Vehicles were not fit for their ordinary and intended purpose of providing Plaintiffs and the other members

of the Nationwide Class with reliable, durable, and safe transportation.

214. Defendant breached the Class Vehicles' implied warranty of merchantability by selling or leasing Plaintiffs and the other members of the Nationwide Class vehicles, and/or components thereof, that are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles suffered from the Defect at the time of sale or lease rendering the Class Vehicles unfit for their particular purpose of providing safe and reliable transportation.

<u>SEVENTH COUNT</u>

<u>(Breach of Written Warranty Under the
Magnuson-Moss Warranty Act, 15 U.S.C. § 230 *et seq*.)</u>

(By All Plaintiffs on Behalf of the Nationwide Class)

215. Plaintiffs, on behalf of themselves and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

216. This claim is brought on behalf of the Nationwide Class.

217. Plaintiffs and other members of the Nationwide Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

218. Toyota is a "supplier[]" and "warrantor[]" within the meaning of 15 U.S.C. §§ 2301(4)-(5).

219.   The Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

220.   Toyota's express warranty is a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

221.   Toyota breached the express warranty by selling and leasing vehicles which they knew, or reasonably should have known, contained the Defect and required repair or replacement within the applicable warranty periods, and/or refused to honor the warranties by providing free repairs and/or replacements during the applicable warranty period or periods.

222.   Toyota's breach of the express warranty deprived the Plaintiffs and the other members of the Nationwide Class of the benefits of their bargain.

223.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

224.   Toyota has been afforded a reasonable opportunity to cure its breach of written warranty, including when Plaintiffs and other members of the Nationwide Class brought their Class Vehicles in for diagnoses and repair of the Defect.

225. As a direct and proximate result of Toyota's breach of written warranty, Plaintiffs and other members of the Nationwide

Class sustained damages and other losses in an amount to be determined at trial. Toyota's conduct damaged Plaintiffs and other members of the Nationwide Class who are entitled to recover damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, rescission, and/or other relief as appropriate.

### EIGHTH COUNT-UNJUST ENRICHMENT

(By All Plaintiffs on Behalf of the Nationwide Class)

226. Plaintiffs, on behalf of themselves and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

227. The warranty had value which Plaintiffs paid, and for which Defendants agreed to render services of repair and replace.

228. The Defendants breached its implied and express warranties in that Class Vehicles were defective with respect to engine materials, workmanship, and manufacture. The Class Vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of faulty materials being used, workmanship and defects in manufacture and design.

229. The Defendants intentionally, negligently and recklessly and/or fraudulently misrepresented the true characteristics of the

Class Vehicles purchased or leased to proposed class representative and class members.

230. The Defendants benefited financially from its breaches of warranty, misrepresentations and fraud as described in this Complaint. The Defendants denied legitimate class vehicle engine warranty claims and obtained further unwarranted financial gain.

231. Plaintiffs and the Class sustained monetary damages as described above.

232. It would be unjust and inequitable to allow Defendants to retain its monetary enrichment from its wrongful and unlawful acts.

233. The Plaintiffs and Class request that the Defendants disgorge profits from its wrongful and unlawful conduct and the Court establish a constructive trust funded by the benefits conferred upon the Defendants as result of its wrongful conduct. The Plaintiffs and Class should be designated beneficiaries of the trust and obtain restitution for out-of-pocket expenses caused by the Defendants' conduct.

<u>NINTH COUNT-DECEPTIVE ACTS AND PRACTICES</u>

<u>(Violations of New York General Business Law §349)</u>

(By McColgan, Stack, Schuman, Lim, Kosoff and Moy n Behalf of the New York Subclass)

234. Plaintiffs McColgan, Stack, Schuman, Lim Kosoff and Moy, on behalf of themselves and all others similarly situated, alleges

and incorporates the above allegations by reference as if fully set forth herein.

235. With regards to Plaintiffs McColgan, Stack, Schuman, Lim Kosoff, and Moy and other members of the Subclass who reside in New York, Defendants' conduct as alleged herein constitutes deceptive acts and practices in the conduct of a business, trade, or commerce or in the furnishing of a service in the State of New York in violation of N.Y. Gen. Bus. Law §349, et seq.

236. Defendants' conduct as alleged herein was directed at consumers such as Plaintiffs, and members of the Subclass, was consumer-oriented misconduct that was misleading in a material respect to a reasonable consumer acting reasonably under the circumstances, and had a broad impact on consumers at large.

237. As a direct and proximate result of Defendants' conduct as alleged herein, consumers such as Plaintiffs and members of the Subclass suffered actual damages in excess of $50 and including economic and financial losses. In particular, as a result of Defendants' deceptive acts, Plaintiffs and the New York Subclass members have purchased Class Vehicles which have an undisclosed Defect which causes Class Vehicles to experience a short at the MGR due to premature corrosion in the cable case that sends power to the electrically driven rear wheels which results in the vehicle being undriveable and requiring expensive repairs and replacement of the cables.  Had Defendant disclosed the Defect in the Class

Vehicles, Plaintiff and the Subclass members would have behaved differently, by either paying less for the Class Vehicles or by not purchasing or leasing a Class Vehicle from Toyota at all. Defendants' deceptive acts and practices as alleged herein were willful and knowing.

238. Plaintiffs and members of the Subclass are entitled to injunctive relief and should be awarded actual damages which should be trebled within the discretion of the Court.

239. Pursuant to N.Y. Gen. Bus. Law §349(h), the New York Plaintiffs and their counsel will seek reasonable attorneys' fees, to be awarded within the discretion of the Court.

### TENTH COUNT-DECEPTIVE ACTS AND PRACTICES

### (Violations of New York General Business Law §349)
((By McColgan, Stack, Schuman, Lim, Kosoff and Moy On Behalf of the New York Subclass)

240. Plaintiffs McColgan, Stack, Schuman, Lim, Kosoff, and Moy, on behalf of themselves and all others similarly situated alleges and incorporates the above allegations by reference as if fully set forth herein.

241. With regards to New York consumers, Defendants' acts, practices and advertisement are of a recurring nature and were directed at consumers.

242. With regards to New York consumers, Defendants' acts, practices and advertisements are materially deceptive and misleading.

243. With regards to New York consumers, Plaintiffs and the Subclass were injured as a result of Defendants' deceptive acts, practices and advertisements. As such, Plaintiffs and the Subclass are entitled to be awarded actual damages which should be trebled within the discretion of the Court, as well as, reasonable attorneys' fees, to be awarded within the discretion of the Court.

### ELEVENTH COUNT-FALSE ADVERTISING

### Violations Of New York's General Business Law §350

(By McColgan, Stack, Schuman, Lim, Kosoff and Moy On Behalf of the New York Subclass)

244. Plaintiffs McColgan, Stack, Schuman, Lim, Kosoff and Moy, on behalf of themselves and all others similarly situated allege and incorporate the above allegations by reference as if fully set forth herein.

245. With regards to New York consumers, Defendants' advertisements were false and misleading in a material respect.

246. With regards to New York consumers, Plaintiffs McColgan, Stack, Schuman, Lim, Kosoff and Moy, and the Subclass, have been aggrieved by Defendants' false advertising, as such, Plaintiffs and the Subclass are entitled to be awarded actual damages which should be trebled within the discretion of the Court, as well as, reasonable attorneys' fees, to be awarded within the discretion of the Court.

## TWELFTH COUNT

## VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
## 73 P.S. §201-1, et seq

**(By Alivey On Behalf of the Pennsylvania Subclass)**

247. Plaintiff, Alivey, on behalf of himself and all others similarly situated alleges and incorporates the above allegations by reference as if fully set forth herein.

248. Plaintiff is a "person" within the meaning of PUTPA, 73 P.S. §201-2(2).

249. Defendants are "persons" within the meaning of PUTPA, 73 P.S. §201-2(2).

250. PUTPA prohibits engaging in any "unfair or deceptive acts or practices" either at, prior to, or subsequent to a consumer transaction. See 73 P.S. §201-2(4) and 73 P.S. §203. Defendants' conduct constitutes "unfair or deceptive acts or practices" pursuant to the statute, including:

(a) Representing that goods have characteristics, uses, or benefits that they do not have, §201-4(v);

(b) Representing that goods are of a particular standard, quality, or grade if they are of another §201-4(vii);

(c) Failing to comply with the terms of any written … warranty given to the buyer at, prior to, or after a contract for the purchase of goods is made, §201-4(xiv), and

(d)   Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding, §201-4(xxi).

251. Defendants violated PUTPA as set forth above, through false or misleading representations through advertising, warranties, and other express and implied statements of value or safety, and failing to disclose to Plaintiff, Alivey, and the Pennsylvania Subclass the Defects associated with the Class Vehicles.

252. Defendants engaged in deceptive trade practices when they failed to disclose material information concerning the Class Vehicles which they knew about at the time of sale, allowing unsuspecting purchasers and lessees to continue to buy and lease the Class Vehicles and continue driving dangerous vehicles.

253. The Defendants' unfair or defective acts or practices were likely to deceive reasonable consumers about the true safety and reliability of the Class Vehicles. The Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead the Plaintiff, Alivey, and members of the Pennsylvania Subclass.

254. The hybrid electric cable corrosion problem is material to the Pennsylvania Subclass. Had they known that of this serious Defect they would either not have purchased the Class Vehicle or

would have paid or leased them for significantly less than they did.

255. The Pennsylvania Subclass suffered, and continues to suffer, an ascertainable loss caused by the Defendants' failure to disclosure material information. They have overpaid for the Class Vehicles and did not receive the benefit of their bargain.

256. The Pennsylvania Subclass is entitled to recover three times their actual damages, costs and reasonable attorneys' fees pursuant to 73 P.S. §201-9.2.

257. Plaintiff, Alivey, and the Pennsylvania Subclass also seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and a positive injunction instituting a Recall to correct this problem or extending the warranty and reimbursement to Subclass Members who have already paid thousands of dollars on this repair.

<u>THIRTEENTH COUNT</u>

<u>VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT</u>
<u>(Md.Comm. Code §13-101 et seq)</u>

(By Johnson On Behalf of the Maryland Subclass)

258. Plaintiff, Johnson, on behalf of herself and all others similarly situated alleges and incorporates the above allegations by reference as if fully set forth herein.

259. Plaintiff Johnson brings this claim on behalf of the Maryland Subclass against Toyota.

260. Toyota is a person as defined by Md. Comm. Code §13-101(h).

261. Toyota's conduct as alleged herein relates to "sales," or "offers for sale," as defined by Md. Comm. Code §13-101(i) and §13-303.

262. Maryland Subclass members are "consumers" as defined by Md. Comm. Code §13-101(c).

263. Toyota advertises, offers, or sells "consumer goods" or "consumer services" as defined by Md. Comm. Code §13-101(d).

264. Toyota advertised, offered, or sold good or services in Maryland and engaged in trade or commerce directly or indirectly affecting the people of Maryland.

265. Toyota engaged in unfair and deceptive trade practices, in violation of Md. Comm. Code §13-101, including:

a. False or misleading oral or written representations that have the capacity, tendency, or effect of deceiving or misleading consumers;

b. Representing that consumer good or services have a characteristic that they do not have;

c. Representing that consumer goods or services ae of a particular standard, quality, or grade that they are not;

d. Failing to state a material fact where the failure deceives or tends to deceive;

e. Advertising or offering consumer goods or services without intent to sell, lease or rent them as advertised or offered; and

f. Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression or omission of any material fact with the intent that a consumer relies on the same in connection with the promotion or sale of consumer goods or services or the subsequent performance with respect to an agreement, sale, lease or rental.

266. Toyota engaged in these unfair and deceptive trade practices in connection with offering for sale or selling consumer goods or services or with respect to the extension of consumer credit in violation of Md. Comm. Code §13-303.

267. Toyota's representations or omissions were material because they were likely to deceive reasonable consumers.

268. Toyota intended to mislead Plaintiff Johnson and the Maryland Subclass members and induce them to rely on its misrepresentations and omissions.

269. Toyota should have disclosed the Defect to Plaintiff Johnson and the Class because they were in a superior position to know the true facts related to the Defect, while Plaintiffs and Class members could not reasonably be expected to learn or discover the true facts related to this Defect.

270. Toyota, by its conduct, statements and omissions described above, knowingly and intentionally concealed from

Plaintiffs and the Class members that the Class Vehicles suffer from the Defect (and the costs, safety risks, and diminished value of the Class Vehicles as a result of this problem).

271. These acts and practices have deceived Plaintiff Johnson and are likely to deceive the Maryland Subclass and the public. Toyota by its conduct, statements, and omissions as described above, and by knowingly and intentionally concealing from Plaintiff and the Class that the Class Vehicles suffer from the Defect (and the costs, safety risks, and diminished value of the Class Vehicles as a result of the corrosion problem), breached their duties to disclose these facts, violated the MCPA and caused injuries to Plaintiff and the Maryland Subclass. The omissions and acts of concealment by Toyota pertained to information that was material to Plaintiff and the Class members, as it would have been to all reasonable consumers.

272. The injuries suffered by Plaintiff and the Maryland Subclass are greatly outweighed by any potential countervailing benefit to consumers to competition, nor are these injuries that Plaintiff and the Maryland Subclass should have reasonably avoided.

273. Toyota's conduct proximately caused injuries to Plaintiff and the other Maryland Subclass members. Had Plaintiff and the Maryland Subclass known about the defective nature of the Class Vehicles, they would not have purchased the Class Vehicles,

would have paid less for them or would have avoided the extensive repair costs associated with the Defect.

274. Plaintiff Johnson and the Maryland Subclass members seek all monetary and non-monetary relief allowed by law, including damages, disgorgement, injunctive relief, and attorney's fees and costs.

## FOURTEENTH COUNT

## VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT OF 1977
## Tenn. Code. Ann. §47-18-104

(By Stinson On Behalf of the Tennessee Subclass)

275. Plaintiff, Stinson, on behalf of herself and all others similarly situated alleges and incorporates the above allegations by reference as if fully set forth herein.

276. Plaintiff, Stinson brings this claim on behalf of the Tennessee Subclass against Toyota.

277. Defendants and Plaintiff are "persons" under Tenn. Code Ann. § 47-18- 103(14).

278. The Vehicle is "goods" under Tenn. Code Ann. § 47-18-103(8) because it is tangible chattel that was purchased or leased for personal, family or household use.

279. Plaintiff is a "consumer" under Tenn. Code Ann. § 47-18-103(3) because she is a natural person who sought or acquired the Vehicle by purchase.

91

280. At all relevant times, Defendants have engaged in "trade," "commerce," and a "consumer transaction" under Tenn. Code Ann. § 47-18-103(20) by advertising, offering for sale, selling, leasing, and/or distributing the subject vehicles in the United States, including Tennessee, directly or indirectly affecting Tennessee citizens through that trade and commerce.

281. The allegations set forth herein constitute false, misleading, or deceptive trade acts or practices in violation of Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-104(a); (b)(5), (7), (19), (21) and (23).

282. Specifically, as alleged above, Toyota knew that the hybrid electric cable and MGR connector was prone to corrosion and failure prior to Plaintiff's and the Tennessee Subclass's purchase of the vehicle and that this defect could result in the unexpected inability to drive the vehicle, increasing the risk of accidents and injuries.

283. As set forth above, Defendants acquired knowledge of this defect through numerous sources which were unavailable to Plaintiff Stinson and the Tennessee Subclass, and yet Defendants failed to disclose the defective nature of the vehicle at the time of purchase by Plaintiff or any time thereafter.

284. This failure to disclose and concealment constitutes a violation of the TCPA as Toyota represented that the Class Vehicle

had characteristics and benefits that it does not have and was of a particular standard, quality or grade was it was of another.

285. Any reasonable person would have considered these details relevant and important in making a decision of whether or not to purchase the Vehicle.

286. Plaintiff Stinson, and the Tennessee Subclass relied to their detriment on these false, misleading and deceptive acts and practices and would not have purchased the Vehicle or would have paid less if made aware of the Defects.

287. The false, misleading, and deceptive acts and practices were the cause of the economic damages sustained by Plaintiff and the Tennessee Subclass.

288. Defendants' intentional concealment constitutes a willful and knowing violation of the TCPA under Tenn. Code Ann 47-18-109(3)-(4) in connection with the purchase of the Vehicle by Plaintiff Stinson and the Tennessee Subclass, which entitles Plaintiff Stinson and the Tennessee Subclass to three times the amount of her economic damages.

289. Plaintiff Stinson and the Tennessee Subclass has provided adequate notice to Defendant. Plaintiff should be awarded three times the amount of her economic damages because of the intentional concealment of the Defect.

290. Toyota's conduct as aforesaid, constitutes an unfair or deceptive act or practice which caused Stinson and the Tennessee

Subclass an ascertainable loss of money or property pursuant to (§47-18-109(a)(1)).

## FIFTEENTH COUNT

### VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT
### (Idaho Code §48-601 et seq.)

**(By Keeley and Loftus On Behalf of the Idaho Subclass)**

291. Plaintiffs, Keeley and Loftus, on behalf of themselves and all others similarly situated alleges and incorporates the above allegations by reference as if fully set forth herein.

292. Plaintiffs Keeley and Loftus brings this claim on behalf of the Idaho Subclass against Toyota.

293. Idaho's Consumer Protection Act ("ICPA") is codified at Idaho Code § 48-601, et. seq.

294. Idaho Code § 48-608 states:

> Any person who purchases or leases goods or services and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by this chapter, may treat any agreement incident thereto as voidable or, in the alternative, may bring an action to recover actual damages or one thousand dollars ($1,000), whichever is the greater. I.C. § 48-608(1).

94

295. Idaho Code § 48-603 sets forth the acts declared to be unlawful, as referenced in Idaho Code § 48-608(1). Idaho Code § 48-603 states that it shall be unlawful to engage "in any act or practice which is otherwise misleading, false, or deceptive to the consumer." I.C. § 48¬603; see also IDAPA 04.02.01.030, ("It is an unfair and deceptive act or practice for a seller to make any claim or representation concerning goods or services which directly, or by implication, has the capacity, tendency, or effect of deceiving or misleading a consumer acting reasonably under the circumstances.").

296. Toyota engages in trade and commerce in the state of Idaho by offering sales and services to consumers in the state.

297. Toyota and/or their agents engaged in acts and/or practices unlawful under Idaho Code § 48-601, et. seq., by, among other things, selling Class Vehicles to Plaintiffs knowing, but failing to disclose before the time of sale, that the hybrid electric cable and MGR connector was prone to corrosion and failure prior to Plaintiffs' purchase of the vehicle and that this defect could result in the unexpected inability to drive the vehicle, increasing the risk of accidents and injuries.

298. Toyota knew, or should have known, that its actions were prohibited by the Idaho Consumer Protection Act.

299. As a direct and proximate result, Plaintiffs Keeley and Loftus and the Idaho Subclass suffered an ascertainable loss of money including, but not limited to, damages for the diminution in the value of the Class Vehicles, and costs associated with attempting to remedy the Defect, in an amount to be determined at trial.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs on behalf of themselves and on behalf of the Nationwide Class, New Jersey Subclass, New York Subclass, Pennsylvania Subclass, Maryland Subclass, Tennessee Subclass and Idaho Subclass prays for judgment against Defendants, Toyota Motor Sales, U.S.A., Inc., Toyota Motor North America, Inc. , and Toyota Motor Corporation as follows:

1.   An Order pursuant to Fed. R. Civ. P. 23 (c) granting Certification of the proposed Nationwide Class, New Jersey Subclass, New York Subclass, Pennsylvania Subclass, Maryland Subclass, Tennessee Subclass and Idaho Subclass, and appointing and designating the law firm, Nagel Rice, LLP to represent the Classes as class counsel pursuant to Fed. R. Civ. P. 23(g);

2.   All recoverable compensatory, statutory and other damages sustained by Plaintiffs and the other members of the Nationwide Class, New Jersey Subclass, New York Subclass, Pennsylvania Subclass, Maryland Subclass, Tennessee Subclass and Idaho Subclass.

3.    Restitution and disgorgement of all amounts obtained by Toyota Motor Sales, U.S.A., Inc., Toyota Motor North America, Inc., and Toyota Motor Corporation as a result of its misconduct, together with interest thereon, from the date of payment, to the victims of such violations;

4. Restitution of incidental expenses incurred by proposed Class Representatives and Class Members including the cost of rental vehicles or substitute transportation;

5.    Actual, treble, and/or statutory damages for injuries suffered by Plaintiffs and the other members of the Classes and Subclasses in the maximum amount permitted by applicable law;

6.    An Order, among other things: (a) requiring Toyota to immediately cease its wrongful conduct, as set forth above; (b) enjoining Toyota from further wrongful practices concerning the distribution, advertisement, marketing, warranting, sale and lease of the Class Vehicles; (c) requiring Toyota to make all repairs and/or replacements necessitated as a result of the Defect in the vehicles purchased or leased by Plaintiffs and the other members of the Nationwide Class, New Jersey Subclass, New York Subclass, Pennsylvania Subclass, Maryland Subclass, Tennessee Subclass and Idaho Subclass; (d) requiring Toyota to refund to Plaintiffs and all members of the Nationwide Class, New Jersey Subclass, New York Subclass, Pennsylvania Subclass, Maryland Subclass, Tennessee Subclass and Idaho Subclass, the funds they were forced to expend

on repairs and/or replacements as a result of the Defect; (e) holding Toyota liable to all members of the Nationwide Class, New Jersey Subclass, New York Subclass, Pennsylvania Subclass, Maryland Subclass, Tennessee Subclass and Idaho Subclass for the diminution in value to the Class Vehicles which have not yet experienced the Defect, and (f) a declaration that Toyota is financially responsible for notifying all members of the Nationwide Class, New Jersey Subclass, New York Subclass, Pennsylvania Subclass, Maryland Subclass, Tennessee Subclass and Idaho Subclass of the Defect, recalling the Class Vehicles and/or extending their warranties to cover the Defect;

7.    Statutory pre-judgment and post-judgment interest on the Class damages;

8.    Injunctive and declaratory relief pursuant to Fed. R. Civ. P. 23(b)(2) declaring that going forward, the hybrid cable corrosion defect and all remedial or replacement necessary to correct the Defect is covered under the Hybrid Component Warranty;

9.    Payment of reasonable attorneys' fees and costs as may be allowable under applicable law; and

10.    Such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all causes of action so triable.


DATED: September 22, 2022                    NAGEL RICE, LLP
                                             *Attorneys for Plaintiffs and*
                                             *the Putative Class*

                                        By:<u>s/ *Bruce H. Nagel*    </u>
                                             Bruce H. Nagel
                                             Randee M. Matloff
                                             103 Eisenhower Parkway
                                             Roseland, New Jersey 07068
                                             973-618-0400
                                             bnagel@nagelrice.com
                                             rmatloff@nagelrice.com

                                             Joseph Santoli, Esq.
                                             340 Devon Court
                                             Ridgewood, New Jersey 07450
                                             201-926-9200
                                             josephsantoli002@gmail.com